**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Chris YOUNG (14–6081); Alto Parnell (14–6451); Brian Vance (15–5045); Demetrius Duncan (15–5738), Defendants–Appellants.**

Nos. 14-6081/14-6451/15-5045/15-5738

United States Court of Appeals,
Sixth Circuit.

Argued: October 19, 2016

Decided and Filed: January 26, 2017

Rehearing En Banc Denied in Nos. 15–5738 and 14–6081 March 14, 2017

334

ARGUED: James G. Thomas, Neal & Harwell, PLC, Nashville, Tennessee, for Appellant in 14–6081. William Nolan, University of Michigan Law School Federal Appellate Litigation Clinic, Ann Arbor, Michigan, for Appellant in 14–6451. Manuel B. Russ, Nashville, Tennessee, for Appellant in 15–5045. Benjamin H. Perry, Nashville, Tennessee, for Appellant in 15–5738. Finnuala K. Tessier, United States Department of Justice, Washington, D.C., for Appellee. ON BRIEF: James G. Thomas, Andrew A. Warth, Neal & Harwell, PLC, Nashville, Tennessee, for Appellant in 14–6081. William Nolan, Melissa M. Salinas, University of Michigan Law School Federal Appellate. Litigation Clinic, Ann Arbor, Michigan, for Appellant in 14–6451. Manuel B. Russ, Nashville, Tennessee, for Appellant in 15–5045. Benjamin H. Perry, Nashville, Tennessee, for Appellant in 15–5738. Finnuala K. Tessier, Sunny A.M. Koshy, United States Department of Justice, Washington, D.C., for Appellee.

Before: KEITH, BATCHELDER, and CLAY, Circuit Judges.

## OPINION

CLAY, Circuit Judge.

Defendants Chris Young ("Young"), Demetrius Duncan ("Duncan"), Alto Parnell ("Parnell"), and Brian Vance ("Vance") (collectively, "Defendants") appeal their convictions and sentences (collectively, "judgments") entered by the United States District Court for the Middle District of Tennessee for conspiracy, *inter alia*, to distribute and possess with intent to distribute 500 grams or more of cocaine and 280 grams or more of cocaine base. The district court sentenced Vance to 200–months' imprisonment, and sentenced Young and Parnell each to two concurrent terms of mandatory life imprisonment without the possibility of parole, and Duncan to mandatory life imprisonment without the possibility of parole.

For the reasons that follow, we **AFFIRM** the district court's judgments for all four Defendants.

## I. BACKGROUND

This case arises out of a multi-year investigation into a large drug-trafficking organization in Clarksville, Tennessee. The leader of the organization, Robert Porter ("Porter"), distributed large quantities of cocaine to Vance, Young, and others. Vance distributed powder and crack cocaine to Parnell, Duncan, and others, using

a stash house in the Summit Heights housing projects and a cookhouse nearby. Parnell and Duncan then sold the cocaine and crack cocaine to Clarksville residents. Federal agents of the Drug Enforcement Agency ("DEA") obtained wiretap applications and search warrants, which provided the government with enough evidence to arrest twenty-six individuals associated with the drug trafficking organization, including Defendants.

Porter was in the process of selling thousands of dollars of cocaine to Young when he was arrested. The morning after Porter's arrest, agents executed search warrants and seized drugs, guns, cash, and drug paraphernalia from the homes of Duncan, Vance, and others. In total, thirty-six individuals were charged in an indictment. Thirty-three of those individuals pleaded guilty, including Vance, who was sentenced to a below Guidelines term of 200–months' imprisonment. Duncan, Young, and Parnell went to trial, and were each found guilty of multiple offenses and sentenced to mandatory terms of life imprisonment without parole.

## Procedural History

### A. Indictment

On January 12, 2011, a grand jury charged Vance, Duncan, Parnell, and Young in a four-count indictment with conspiracy, among other things, to distribute and possess with intent to distribute controlled substances, including 500 grams or more of cocaine and 280 grams or more of cocaine base, otherwise known as crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count One). Vance was also charged with possession with intent to distribute crack cocaine, in violation of § 841(a)(1) (Count Two).

### B. Superseding Indictment

On April 17, 2013, a grand jury returned a twenty-two count superseding indictment charging, among other things, Duncan, Parnell, and Young with conspiracy to distribute and possession with intent to distribute 500 grams or more of cocaine and 280 grams or more of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and 18 U.S.C. § 2 (Count One).

Vance was also charged with being an accessory after the fact to a Hobbs Act violation and to possession and discharge of a firearm in furtherance of a crime of violence resulting in death, in violation of 18 U.S.C. §§ 1951, 924(c), and 924(j) and 18 U.S.C. §§ 2 and 3 (Count Eight) and conspiracy to commit a Hobbs Act robbery, in violation of 18 U.S.C. §§ 1951 and 2 (Count Nine).

Duncan and Parnell were separately charged with possessing cocaine and crack cocaine within 1,000 feet of a public housing authority with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 860 and 18 U.S.C. § 2 (Count Four). Duncan was individually charged with: possession of cocaine base and marijuana with intent to distribute, in violation of § 841(a)(1) (Count Sixteen); possession of a firearm in furtherance of a drug trafficking offense, in violation of §§ 841(a)(1) and 846 and § 924(c) (Count Seventeen); and being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924 (Count Eighteen). Young was also charged separately with: attempted possession of cocaine within 1,000 feet of a school with intent to distribute, in violation of §§ 841(a)(1), 846, and 860 (Count Eleven); possession of a firearm in furtherance of a drug trafficking offense, in violation of §§ 841(a)(1) and 846 and § 924(c) (Count Twelve); and being a felon in possession of a firearm, in violation of §§ 922(g)(1) and

924 (Count Thirteen).[1]

### C. Vance Pleads Guilty to Remaining Charges

Vance pleaded guilty to the conspiracy and possession charges on April 15, 2013. On June 10, 2013, Vance pleaded guilty to both Hobbs Act counts, and on September 16, 2013, the district court sentenced Vance to a 200–month term of imprisonment and a five year term of supervised release.

### D. Trial and Sentencing

On August 6, 2013, trial commenced on the remaining counts for Young, Duncan, and Parnell. The government provided evidence in the form of testimony from five co-conspirators and a witness to a warranted search of Duncan's residence, testimony from law enforcement agents, more than two hundred intercepted phone conversations between co-conspirators, surveillance footage, and evidence seized during the warranted searches and arrests. The jury convicted Duncan, Parnell, and Young on all counts, except for Duncan, who was acquitted on Count Four.

On September 28, 2014, the district court sentenced Young to concurrent mandatory terms of life imprisonment on the drug-related offenses (Counts One and Eleven). On November 24, 2014, the district court sentenced Parnell to concurrent mandatory terms of life imprisonment on Counts One and Four. On April 27, 2015, the district court sentenced Duncan to a mandatory term of life imprisonment on Count One.

### Statement of Facts

Robert Porter, the leader of the Vice Lords drug organization, trafficked large amounts of cocaine in Clarksville, Tennes-see. Porter obtained the cocaine from suppliers, such as Quinice Cross and Gregory Brooks ("Brooks"). Brooks testified at trial that he supplied Porter with 10 kilograms of cocaine between 2009 and 2010, with each kilogram costing between $30,000 and $35,000. Porter would then supply Vance, Young, and others with cocaine. Donnie Patterson ("Patterson"), a co-conspirator, testified at trial that Porter would supply him with a quarter to half a kilogram of cocaine about twice a week. Patterson also testified that he saw Porter supply Vance with cocaine. Dmitri Johnson ("Johnson"), another co-conspirator, testified that he saw Porter cook powder cocaine into crack cocaine at his home on a regular basis, and that he witnessed Porter supply crack cocaine to Young at least twice.

### A. Young's Involvement in the Conspiracy

Intercepted telephone conversations between Young and Porter and surveillance footage revealed that Porter had provided Young with tens of thousands of dollars of cocaine for distribution. For instance, on September 12, 2010, Young told Porter that he was "waitin on one more person" and with that he should have "fifty five all together," or $5,500, for the cocaine that Porter had provided him. (Appendix A GX 98a.)

Porter also taught Young how to cook crack cocaine. During a long phone call on September 18, 2010, Young discussed with Porter his concern that he was not producing all of the crack he could be, due to his inability to properly cook the powder. "I clearly seen when I knocked it down that it was not all that it was supposed to be … [It] wasn't nothin but twelve but I'm wonderin like why and how did it be like that." (Appendix A GX 136a.) Porter then

---

**1.** On August 1, 2013, Young pleaded guilty to the felon-in-possession count.

told Young that he was not "trippin ... I still [mess] up too ... so that aint your first time that aint goin to be your last." (*Id.*)

On December 9, 2010, a federal magistrate judge issued a search warrant. On December 10, 2010, agents executed the warrant for Porter while he was in the middle of selling cocaine to Young at a gas station. Agents located a cell phone inside Porter's car. They also found bundles of cash, totaling $10,190 underneath where Young was sitting in the vehicle and from his pants pocket. Additionally, the agents uncovered a loaded handgun, as well as a digital scale from the center console of Young's car. The scale was covered in white residue that later tested positive for cocaine. During trial, Young stipulated that he unlawfully possessed the loaded gun.

Although not directly related to Young's involvement in the conspiracy, agents recovered 192 grams of cocaine and 159 grams of crack cocaine from the center console of Porter's vehicle during the arrest.

## B. Vance's Involvement

Vance, the highest-ranking member of the gang out of the four Defendants in this appeal, sold the cocaine he purchased from Porter to Duncan, Parnell, and others. On December 11, 2010, a search warrant was executed at Vance's residence, where agents seized $11,000 from a safe, 90 grams of crack cocaine, marijuana, a holstered and loaded firearm, ammunition, gun cases for the holstered firearm, gun cases for a pistol, and boxes for an assault rifle. Testimony at the trial also revealed that Vance cooked powder cocaine into crack cocaine at the residence of Jevita Banister on Happy Hollow Road.

## C. Parnell's Involvement

Parnell usually obtained cocaine directly from Vance; however, on August 27, 2010, Vance told Parnell over an intercepted telephone conversation that he obtained his drugs from Porter, and Parnell responded that he had "figured that." (Appendix A GX 73a.)

On various occasions, Vance and Parnell were worried that they and their fellow gang members were on the verge of being caught by the authorities. For instance, on August 6, 2010, Parnell telephoned Vance to warn him about the police "vice truck, the K–9 truck" and how it had pulled someone over on Thompkins Lane. (Appendix A GX 27a.) In another conversation on October 9, 2010, Vance called Parnell to inform him that he could not come over because he was "packed" and "too dirty." (Appendix A GX 163a.) In that same conversation, Parnell asked Vance how he did, or how he "pull[ed]" last night," and Vance responded that he "had nothing but a quarter," and that he "put 21 in and got 19, the shit look like [ ] if you crush it up it look ... real funny, crunchy looking but it jumped though ... and the powder real real hard." (*Id.*) On November 20, 2010, Vance and Parnell discussed how law enforcement arrested other members of the conspiracy and how they "almost caught [Parnell] walking out of Toya's crib [ ] with an ounce of powder on [him]." (Appendix A GX 191a.) Vance and Parnell also discussed enlisting younger individuals to sell the cocaine and crack cocaine for them: "They gotta sell it. They got to." (*Id.*) Vance then stated, "[I]f we fall it's a [w]rap ... [w]hat they gonna do ... without me or you?" (*Id.*)

## D. Duncan's Involvement

Duncan usually obtained crack cocaine from Vance in one-ounce quantities (28 grams), which he then sold to others. On

October 29, 2010, Duncan called Vance to ask about buying some "whip" because he had "three plays." (Appendix A GX 175a.) Testimony from law enforcement agents at trial revealed that "whip" stands for crack cocaine, and a "play" is a customer. On November 17, 2010, Duncan and Vance discussed how much cocaine Duncan had purchased from Vance and then sold to clients, and how much Vance was storing at Duncan's. (Appendix A GX 187a) (Vance stated to Duncan that "you had nine, you sold one that made eight, and I put three with it, [t]hen I took it, I took four, so theres [sic] seven of that there ... seven whip."). Duncan obtained cocaine and crack cocaine from other members of the conspiracy. For example, on November 24, 2010, when Duncan asked Vance for nine ounces (255 grams) of cocaine powder to cook into crack cocaine, Vance told him to call Young Money (another co-conspirator). (Appendix A GX 197a). Duncan was also aware that Porter was Vance's supplier. For instance, on September 7, 2010, Duncan spoke with Vance on the telephone and asked if Porter was still selling cocaine and crack cocaine by the ounce. (Appendix A GX 89a).

On December 11, 2010, agents executed a search, pursuant to the search warrant issued December 9, 2010, of Duncan's home. During the search, agents found a Smith & Wesson .40 caliber handgun, three loaded magazines for the .40 caliber handgun, and a gun holster in Duncan's bedroom, right near a $902 stack of cash. Duncan stipulated at trial that he was a convicted felon prohibited from possessing a firearm.

## II. DISCUSSION

Defendants raise numerous challenges to their convictions and sentences. Specifically, Duncan argues that the district court erred in denying: (1) his motions to sup-press the communications intercepted from Vance's phone, and the drugs, guns, and cash seized from Duncan's home pursuant to the search warrant; and (2) his request for an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

Parnell argues that the district court erred in admitting: (1) co-conspirator statements; (2) a law enforcement agent's testimony concerning background evidence about the investigation; (3) cooperating witness testimony about their guilty pleas; (4) evidence of gun crimes committed by co-conspirators and co-defendants; and (5) evidence of other crimes committed in furtherance of the conspiracy.

Young, Parnell, and Duncan argue that the district court erred in: (1) admitting a law enforcement agent's testimony interpreting the wiretapped conversations during trial; (2) failing to give a cautionary jury instruction addressing the dual roles of the testimony given by the case agents; (3) declining to strike 21 U.S.C. § 851 informations; and (4) concluding that the Eighth Amendment does not prohibit a term of life imprisonment for a drug felon convicted of conspiracy to distribute 500 grams or more of cocaine and 280 grams or more of crack cocaine.

Finally, Parnell and Vance challenge their respective sentences.

### A. Motions to Suppress

Duncan challenges the district court's denial of motions to suppress filed by Vance and Duncan with regard to the wiretap for Vance's phone, which intercepted calls between Vance and Duncan, in addition to subsequent wiretap applications and renewals relying on that wiretap application.

### 1. Waiver

First and foremost, we conclude that Duncan has waived his challenge to the denial of the motions to suppress. Duncan merely cites to the governing rules and relevant case law on Fourth Amendment jurisprudence and wiretap applications, without citations to the record explaining why there was no probable cause. Duncan attempts to provide justification for his perfunctory argument by explaining that the "word limitations of the instant Brief do[ ] not allow for the parsing of the deficiencies in the 16 authorizations at issue in this appeal." (Duncan Br. 34.) Duncan then points to the "respective motions [to suppress] in the record" for the "particularized analysis relevant to each application." (Duncan Br. 34.) Federal Rule of Appellate Procedure 28(a)(8)(A) provides that the argument section of an appellate brief must contain "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies." Fed. R. App. P. 28(a)(8)(A).

■ Here, Duncan cites to the parts in the record where the motions to suppress are located, and also to the part where the district court denied them. However, Duncan does not point to any findings in the record which would demonstrate how the district court erred or why the wiretap application lacked probable cause. *See United States v. Meda*, 812 F.3d 502, 519 (6th Cir. 2015) (holding argument in brief that was not supported by citation need not be addressed by the court pursuant to Federal Rule of Appellate Procedure 28(a)(8)(A)); *see also Dog Pound, LLC v. City of Monroe, Mich.*, 558 Fed.Appx. 589, 594 (6th Cir. 2014) (holding that appellant waived argument on appeal by failing to "advance a single argument as to why the judgment of the district court ... was in error," and the "district court's reasoning [was not] brought into question.").

Even if Duncan did not waive this argument, his challenge to the denial of the motions to suppress would still fail because the wiretap application established probable cause that surveillance of Vance's telephone would reveal communications concerning drug trafficking and necessity for the warrant.

### 2. Standard of Review

■ When reviewing a district court's decision on a motion to suppress, we review the lower court's findings of fact for clear error and its conclusions of law *de novo*. *United States v. Lyons*, 687 F.3d 754, 762 (6th Cir. 2012) (citing *United States v. Howard*, 621 F.3d 433, 450 (6th Cir. 2010)). A factual finding is clearly erroneous when the Court, on reviewing the evidence, "is left with the definite and firm conviction that a mistake has been committed." *United States v. Navarro–Camacho*, 186 F.3d 701, 705 (6th Cir. 1999) (citation omitted). Whether a search and seizure was reasonable under the Fourth Amendment is a question of law. *United States v. Gunter*, 551 F.3d 472, 479 (6th Cir. 2009) (citing *United States v. Galloway*, 316 F.3d 624, 628 (6th Cir. 2003)). Because the district court denied the motions to suppress, we review all evidence in the light most favorable to the government. *United States v. Long*, 464 F.3d 569, 572 (6th Cir. 2006).

### 3. Analysis

#### a. Wiretap of Vance's Phone

Duncan first argues (1) that the affidavit in support of the wiretap application failed to establish probable cause, and (2) the wiretaps were not necessary to the investigation because the investigation's objectives could have been satisfied without

resorting to such an extraordinary surveillance technique.

■ In order to conduct electronic surveillance using a wiretap, federal law enforcement officials must secure authorization by making an application containing "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). This provision, commonly referred to as the "needs statement provision," was designed to insure that wiretapping is not resorted to in a situation where traditional investigative techniques "would suffice to expose the crime." *United States v. Alfano*, 838 F.2d 158, 163 (6th Cir. 1988) (citation and internal quotations marks omitted). "[W]hat is needed is to show that wiretaps are not being routinely employed as the initial step in criminal investigation." *Id.* (citations and internal quotation marks omitted). A district court has "considerable discretion" in determining whether the requirements of § 2518(1)(c) have been satisfied. *United States v. Stewart*, 306 F.3d 295, 304 (6th Cir. 2002) (citation and internal quotation marks omitted).

### i. Probable Cause in Affidavit

■ We hold that the affidavit underlying the wiretap application for Vance's phone established probable cause that a wiretap of Vance's phone would lead to evidence relating to the Porter drug trafficking organization. The affiant, Agent Whitsett, noted that he had participated in the investigation of the Porter drug trafficking organization since 2006 and was familiar with the facts and circumstances of the investigation due to his oral and written communications with other DEA agents, other federal, state and local law enforcement agencies, and confidential informants. Agent Whitsett provided information specifically relating to Vance's telephone, *i.e.*, Target Telephone 2 ("TT2"). Agent Whitsett stated that in the course of interceptions of Target Telephone 1 ("TT1"), a phone used by known drug trafficker, Donnie Patterson, agents verified that Patterson called TT2 from TT1 after a confidential informant asked Patterson if he had any drugs to sell.

Agent Whitsett confirmed that Vance, also known as "Bird," was using TT2 to talk to Patterson about availability and pricing for controlled substances. (R. 752, Agent Whitsett's Wiretap Affidavit for Vance's Telephone, PageID# 2712–13.)[2] Agent Whitsett also noted that Patterson called Vance on TT2, in which Vance references that he is "in the kitchen." (*Id.* at 2714.) Agent Whitsett discussed in the affidavit that "in the kitchen" or "cooking" are code terms for manufacturing crack cocaine, and that Vance's reference to one of these terms meant that he was in the kitchen making crack cocaine. (*Id.*) On another phone call, Patterson called Vance and discussed the arrests of fellow drug dealers and Vance's run from police when he was "loaded," which means, according to Agent Whitsett, that Vance was carrying controlled substances on his person. (*Id.* at 2715–19.)

In another phone call between Vance and Patterson, Patterson asks Vance for money, and Vance replies that Vance "can get [Patterson] five thousand if [he] need[s] it." (*Id.* at 2720–21.) Agent Whitsett notes that Vance is letting Patterson

---

**2.** We note that the PageID numbers correspond to either to the PageID number listed at the top right-hand corner of the document or the page number of the individual document due to the voluminous nature of the record and the fact that parts of the record did not have PageID numbers listed at the top of the page.

know that he has large sums of money on him. Agent Whitsett also provides information in the affidavit on prior drug investigations involving Vance for crack cocaine and manufacturing of crack cocaine offenses. Additionally, Agent Whitsett described TT2's toll analysis which showed an "extreme frequency" of calls to and from TT2 over a short period of time, and contact with telephone numbers associated with other known or suspected controlled substance traffickers. Agent Whitsett described both of these observations as indicators that the phone is being used to traffic controlled substances.

### ii. Wiretap was Necessary

■ Second, we find that the government met their burden of demonstrating necessity. The government "is not required to prove that every other conceivable method has been tried and failed or that all avenues of investigation have been exhausted." *Alfano*, 838 F.2d at 163. We have summarized the "necessity requirement" as follows:

> All that is required is that the investigators give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate.

■ *Id.* at 163–64. This is precisely what the government did in this case. Agent Whitsett stated in the wiretap application that the agents used telephone toll records and pen register data as an investigative tool; however, he noted that "[t]his technique . . . only will provide agents with a list of numbers called and will not establish the identities of the persons called or the content of the conversations. . . . Such information is most productive when used in conjunction with intercepted conversa-

tions." (R. 752 at 2732.) Moreover, the affiant noted that "the information gleaned from [these] telephone records alone has not enabled agents to identify additional Target Subjects, i.e., the source(s) of supply, or ascertain the inner-workings of the organization." (*Id.*)

Additionally, with regard to the use of confidential informants and cooperating co-defendants, Agent Whitsett stated that "[e]ven though confidential sources and co-operating defendants provide valuable information and assistance, [the] [a]ffiant believes that such information is limited and the continued use of confidential sources and or cooperating defendants, even combined with other conventional investigative techniques, would not result in the dismantlement of the [Porter Drug Trafficking Organization] PDTO." (*Id.* at 2737.) Agent Whitsett also noted that, with regard to the use of undercover agents as another investigative technique, "[m]embers of large-scale drug trafficking organizations are particularly suspicious of individuals with whom they are not familiar." (*Id.*) Agent Whitsett stated that "it is extremely unlikely that an undercover agent could successfully infiltrate [the PDTO]" at such a high level. (*Id.*) Moreover, the case agent noted that they had asked a confidential informant familiar with Vance to assist law enforcement in targeting Vance, but that he was unwilling to do so. (*Id.*) The affiant also mentioned how Grand Jury subpoenas would reveal the investigation and expose the prosecution before it was necessary to do so, and how physical undercover surveillance, especially in concentrated residential areas, is often impossible as there is a high risk that the surveillance will be spotted by the Target Subjects. (*Id.* at 2730–31.)

The district court, after holding a hearing on the motion to suppress, found that there was probable cause for authorization

of the wiretaps. The court found that there was a substantial basis to conclude that there was an on-going conspiracy that had been in existence for many years, and thus, the "[wire]taps and the reasons therefor[e] are current and not stale." (R. 2374, Wiretap Hearing, PageID# 12343.) The district court further found that the case agent met the burden of necessity because he demonstrated that "traditional techniques have been considered or employed such as confidential information, physical surveillance, pen registers, toll information, financial investigations, Grand Jury subpoenas, undercover agent and tracking devices," which "clearly evidence[d] the limitations and the need for wiretap surveillance in order to complete the investigation of the conspiracy." (R. 2374 at 12345–46.)

Duncan argues that the government could have "take[n] down the [ ]PDTO during the time period they were readily using CIs," but did not do that "in order to stockpile evidence that ultimately lead to the request for wiretaps." Duncan also argues that the stated wiretap objective was to learn the identity of the leaders and sources, but law enforcement knew the identity of these individuals for years prior to the wiretap, thus, this objective could have been met without resort to wiretapping. We are not persuaded by Duncan's arguments because the stated objective of the investigation was to dismantle the drug trafficking organization, and wiretapping individuals alleged to be involved in the conspiracy certainly furthered that objective. Thus, we hold that the district court did not err in denying the motion to suppress because the affidavit gave a substantial basis for finding probable cause and necessity.

### b. Search of Duncan's Residence

Duncan next argues that the district court erred in denying his motion to suppress the evidence obtained from the search of residence because: (1) the search warrant was without probable cause because it relied on communications from the unlawful wiretaps; (2) the affidavit underlying the search warrant possessed no information that drug trafficking occurred at the residence; (3) the affidavit possessed no information that Duncan resided at the residence searched; (4) the affidavit fails to establish any reasonable nexus between drug trafficking and the residence searched; and (5) the affidavit relied on stale information

 To determine whether probable cause for a search exists, a judge issuing a warrant must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The duty of a reviewing court is to insure that the magistrate judge had a "substantial basis" for concluding that probable cause existed. *Id.* (citation and internal quotation marks omitted). In order to establish probable cause, there must be a nexus between the place to be searched and the evidence sought. *See United States v. Laughton*, 409 F.3d 744, 747 (6th Cir. 2005) (citations omitted).

 We conclude that the issuing judge had a substantial basis for concluding that probable cause for a search existed. As mentioned above, the wiretaps were not unlawful. Thus, evidence obtained pursuant to the intercepted communications can be relied upon by the issuing judge to conclude that probable cause existed for the search of the residence.

Numerous wiretapped phone calls between Duncan, Porter, Vance, and other members of the conspiracy demonstrate that Duncan resides at 964 Woody Hills Drive, and used the residence to store cocaine, proceeds from the sale and/or receipt of narcotics trafficking, narcotics trafficking paraphernalia, and firearms.

The affidavit identified Duncan as a ranking member of the Vice Lord street gang who supplied cocaine to numerous Vice Lord gang members. The wiretaps identified a number of locations being used to store cocaine and marijuana along with cash from the sale of controlled substances. One of the locations was 964 Woody Hills Drive, Clarksville, Tennessee. GPS on one of Vance's wiretapped telephones placed Vance at the Woody Hills Drive location when he stated he was at "Whirley's," which is a moniker used to refer to Duncan by the members of the conspiracy.

For instance, on September 13, 2010, Porter called Duncan and in that phone conversation, Duncan informed Porter that he had $600.00 with which he wished to purchase cocaine from Porter. On October 29, 2010, Duncan called Vance and stated that he had "about three plays," that Vance had "no whip," and that Vance would have to "get to it." (R. 403, Search Warrant Application, PageID# 177–78.) The affiant stated that the term "play" is used by crack cocaine traffickers to describe a customer, the term "whip" refers to crack cocaine." (*Id.*)

On November 21, 2010, Vance, using a wiretapped telephone, made a call to Duncan, in which Vance stated that he "left [his] strap over there." (*Id.* at 178.) Duncan then responded, "[O]ver at my house?," to which Vance responded in the affirmative. (*Id.*) Vance then stated that he was going to take Duncan's gun that night, and Duncan responded that he did not want Vance to take his gun because he would not stay at his residence without a firearm. The affiant believed that this call showed that both Vance and Duncan are regularly armed with a firearm, that Vance left his firearm at Duncan's residence, and that Duncan generally has his firearm at that residence.

The affidavit also stated that on April 2, 2010, Duncan received a traffic ticket and gave his address as 964 Woody Hills Drive. The affidavit also establishes that electric service at that location is in the name of Mary A. Duncan. When Duncan was arrested on September 21, 2008, he had a tattoo "Mary Ann Duncan" on his back and gave 964 Woody Hills Drive as his address. (*Id.*)

Together, these interceptions, along with others noted in the affidavit, establish probable cause for a search of Duncan's residence. *See United States v. Williams*, 544 F.3d 683, 686 (6th Cir. 2008) ("[T]he courts should take a totality of the circumstances approach in their review of the affidavit, and the courts may afford considerable weight to the conclusion of experienced law enforcement officers regarding where evidence of a crime is likely to be found and [the courts are] entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the crime and type of offense.") (citations and internal quotation marks omitted). In *Williams*, we joined our sister circuits that have held in "cases involving a variety of suspected crimes, that an issuing judge may infer that a criminal suspect keeps the 'instrumentalities and fruits' of his crime in his residence." 544 F.3d at 688 (collecting cases). Here, it was reasonable for the issuing judge to infer that a ranking member of a criminal enterprise kept money, guns, and drugs at his residence. Therefore, we find that the district court did not err in denying the motion to sup-

press the fruits of the search of Duncan's residence.

 In addition, the warrant did not rely on stale evidence because the conspiracy at issue was ongoing and the place to be searched was a secure operations base for the conspiracy. *See United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998) (citing W. LaFave, *Search and Seizure* § 3.7 (3d ed. 1996) (noting as a general matter that stale information cannot be used in a probable cause determination)). The staleness probe depends on the "inherent nature of the crime." *Id.* (quoting *United States v. Henson*, 848 F.2d 1374, 1382 (6th Cir. 1988)). We must inquire into whether information in the affidavit that is arguably three to six weeks old is stale. *Cf. United States v. Frechette*, 583 F.3d 374, 378 (6th Cir. 2009) (noting that information that is sixteen-months old in the drug trade is usually stale because drugs are sold and consumed in a prompt fashion).

In analyzing whether information is stale, this Court considers the following factors:

(1) the character of the crime (chance encounter in the night or regenerating conspiracy?),

(2) the criminal (nomadic or entrenched?),

(3) the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), and

(4) the place to be searched (mere criminal forum of convenience or secure operational base?).

*Frechette*, 583 F.3d at 378 (citing *United States v. Abboud*, 438 F.3d 554, 572–73 (6th Cir. 2006) (citation omitted)). *See also United States v. Kennedy*, 427 F.3d 1136, 1142 (8th Cir. 2005) ("[I]nformation of an unknown and undetermined vintage relaying the location of mobile, easily concealed,

readily consumable, and highly incriminating narcotics could quickly go stale in the absence of information indicating an ongoing and continuing narcotics operation.") (citations omitted).

Specifically, Duncan argues that the affidavit does not establish the 964 Woody Hills residence as a "notorious drug den" because at most, the search warrant provides only "six attempted purchases by Defendant Duncan." Duncan further avers that five of these attempted purchases occurred during a 37–day period ending on September 13, 2010, and the sixth conversation occurred on October 29, 2010. Duncan argues that this pattern is more indicative of an addict than a drug dealer, and that there is no allegation that Duncan attempted to purchase narcotics within 41 days prior to the submission of the search warrant application on December 9, 2010.

We find Duncan's argument unpersuasive. First, the character of the crime, conspiracy to traffic narcotics, is not a chance encounter in the night. It is a regenerating conspiracy. *See Abboud*, 438 F.3d at 573; *United States v. Greene*, 250 F.3d 471, 481 (6th Cir. 2001) (finding information supplied by an informant two years prior to issuance and execution of search warrant was sufficient to defeat claim of staleness due to ongoing nature of illegal activity because informant had purchased narcotics at least twelve times at defendant's house); *see also United States v. Canan*, 48 F.3d 954, 959 (6th Cir. 1995) (finding ongoing activity at the defendant's house four years prior to issuance and execution of the search warrant was sufficient to defeat claim of staleness).

Second, the affidavit established that Duncan was not nomadic. Indeed, the information in the affidavit indicated that Duncan lived in the Woody Hills residence from at least September 21, 2008, when, upon being arrested, he listed this address

as his residence, to November 21, 2010, when he referred to the Woody Hills residence as his house in an intercepted phone call with Vance. Although the warrant was not issued and executed until three weeks after the November 21, 2010 conversation, the information in the affidavit indicated that Duncan lived in the same house for the period leading up to the search. *See Abboud*, 438 F.3d at 573.

Regarding the last two *Abboud* factors, although generally speaking, narcotics are easily consumable and mobile, narcotics underlying an ongoing conspiracy to traffic drugs are likely to be at an operational base. Thus, the affidavit contained information which established that Duncan purchased and sold narcotics from the Woody Hills residence throughout the period leading up to the search. *See Spikes*, 158 F.3d at 924 (stating that "the affidavit provide[d] a continuing series of incidents involving either the manufacture, sale, or distribution of crack cocaine that are all connected in one form or another to [defendant's residence]".) Indeed, all of the *Abboud* factors indicate that the evidence was not stale in this case.

As discussed in the next section, Duncan argues that the affidavit contained false information because Agent Whitsett did not inform the issuing judge that one of the confidential informants was related to Vance. Even with the inclusion of this information, there was a substantial basis for the determination of probable cause to search Duncan's residence. The 187–page affidavit contained information that Duncan illegally possessed a firearm in his home and that he was a drug trafficker for the Porter drug-trafficking organization who purchased and sold drugs out of his home.

Even if Duncan did not waive his argument and even if the district court erred in denying Duncan's suppression motion, the error was harmless because the evidence presented at trial, separate and apart from the evidence seized from his home, proved beyond a reasonable doubt that Duncan participated in the trafficking conspiracy. The jury listened to Duncan discuss his drug sales and possession of firearms with Vance on intercepted calls, among other pieces of evidence that were presented to the jury.

### c. Failure to Provide a *Franks* Hearing

Lastly, Duncan argues that the district court erred in denying a *Franks* hearing because the wiretap applications contained deliberate falsehoods or statements that were made with a reckless disregard for the truth. Duncan briefly mentions in his statement of facts that Agent Whitsett deliberately withheld information and misled the issuing judge as to the relationship between a confidential informant and Vance, the relationship being that the confidential informant was a relative of Vance.

Whether to hold an evidentiary hearing based upon a challenge to the validity of a search warrant's affidavit, given alleged misstatements and omissions, is committed to the sound discretion of the district court. *See United States v. Graham*, 275 F.3d 490, 505 (6th Cir. 2001). When reviewing the district court's denial of a *Franks* hearing, we review findings of fact for clear error and conclusions of law *de novo*. *United States v. Pirosko*, 787 F.3d 358, 369 (6th Cir. 2015) (quoting *United States v. Rose*, 714 F.3d 362, 369–70 (6th Cir. 2013)).

"A defendant is entitled to a *Franks* hearing if he: 1) makes a substantial preliminary showing that the affiant knowingly and intentionally, or with reckless disregard for the truth, included a false statement or material omission in the

affidavit; and 2) proves that the false statement or material omission is necessary to the probable cause finding in the affidavit." *Pirosko*, 787 F.3d at 369 (citations and internal quotation marks omitted).

 We find that the district court did not err in denying a *Franks* hearing because the record demonstrates that Duncan did not put forth a strong preliminary showing that Agent Whitsett intended to mislead and exclude critical information from the affidavit. Duncan presented nothing more than an *allegation* that Agent Whitsett intended to mislead the issuing judge. *See United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990) (noting that the allegations must be more than conclusory and must be accompanied with an offer of proof and supporting affidavits, and if this is satisfied, then the issue becomes whether, absent challenged statements, there remains sufficient content in the affidavit to support a finding of probable cause). Duncan has not met this "heavy burden." *Id.* Duncan does not argue why this information was critical to the finding of probable cause. More importantly, there was sufficient content in the affidavit regardless of whether this information was included or not. Accordingly, we conclude that the district court did not err in denying a *Franks* hearing.

Therefore, Duncan waived his arguments challenging the motions to suppress and the denial of the *Franks* hearing, and even if he had not waived these arguments, the district court did not err in denying the motions to suppress and the *Franks* hearing.

## B. Evidentiary Rulings

Next, Young, Parnell, and Duncan argue that the district court erred in admitting Agent Whitsett's testimony which interpreted the wiretapped conversations. Parnell additionally challenges whether the district court erred in admitting: (1) co-conspirator statements; (2) the case agent's testimony concerning background evidence about the investigation; (3) cooperating witnesses testimony about their guilty pleas; (4) evidence of gun crimes committed by co-conspirators and co-defendants; and (5) evidence of other crimes committed in furtherance of the conspiracy.

### 1. Standard of Review

 We review a district court's evidentiary rulings for an abuse of discretion. *United States v. Kilpatrick*, 798 F.3d 365, 378 (6th Cir. 2015). In determining whether the district court abused its discretion, the Court "must view the evidence in the light most favorable to the government by maximizing the probative value of the evidence and minimizing its potential prejudice." *United States v. Sanders*, 95 F.3d 449, 453 (6th Cir. 1996) (citation omitted). The prejudice to be weighed is the *"unfair* prejudice caused by admission of the evidence. Evidence that is prejudicial only in the sense that it paints the defendant in a bad light is not unfairly prejudicial pursuant to [Federal] Rule [of Evidence] 403." *Id.* (citing *United States v. Mullins*, 22 F.3d 1365, 1373 (6th Cir. 1994)). This Court reviews an evidentiary ruling for plain error if a defendant fails to object at trial. *Kilpatrick*, 798 F.3d at 378 (citing *United States v. Olano*, 507 U.S. 725, 731–32, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)).

 An erroneous evidentiary ruling does not automatically result in a new trial. *Id.* Evidentiary errors are subject to harmless error review. *Id.* Under the "harmless error" rule, any "error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." Fed. R. Crim. P. 52(a). Non-constitutional errors are subject to the Rule 52(a) harmless error analysis, in which the gov-

ernment must show by a preponderance of the evidence that the error did not materially affect the verdict. *Kilpatrick*, 798 F.3d at 378. In cases where a non-constitutional error occurred, when the record is "so evenly balanced that a conscientious judge is in grave doubt as to the harmlessness of an error," the judgment must be reversed. *Id.* at 379–80 (quoting *O'Neal v. McAninch*, 513 U.S. 432, 437–38, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995)). When a constitutional error occurs, the government must prove beyond a reasonable doubt that the error did not affect the verdict. *United States v. Miner*, 774 F.3d 336, 342, 350 (citing *Neder v. United States*, 527 U.S. 1, 15, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999)).

### 2. Agent Whitsett's Testimony

Young, Duncan, and Parnell argue that Agent Whitsett's testimony was by based on generalized knowledge without any specific foundation, and Agent Whitsett invaded the jury's province by repeatedly interpreting ordinary English language terms in violation of *United States v. Freeman*, 730 F.3d 590, 595–99 (6th Cir. 2013).

▬▬▬ Courts frequently qualify law enforcement officers as expert witnesses under Federal Rule of Evidence 702 to interpret intercepted conversations that use "slang, street language, and the jargon of the illegal drug trade." *Kilpatrick*, 798 F.3d at 379 (quoting *United States v. Peoples*, 250 F.3d 630, 641 (8th Cir. 2001)). Conversely, when a law enforcement officer is not an expert witness, the officer's lay opinion testimony is admissible "only when the law enforcement officer is a participant in the conversation, has personal knowledge of the facts being related in the conversation, or observed the conversations as they occurred." *Id.* (citation and internal quotation marks omitted). Federal Rule of Evidence 701 states that if a witness is not testifying as an expert, "an

opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. The proponent of this testimony must establish that all three requirements are met. *Freeman*, 730 F.3d at 595–96. The purpose of lay opinion testimony is to "describ[e] something that the jurors could not otherwise experience for themselves by drawing upon the witness's sensory and experiential observations that were made as a first-hand witness to a particular event." *Id.* at 595 (citation and internal quotation marks omitted).

#### a. Interpreting Wiretapped Interceptions

Young, Duncan, and Parnell failed to object to most of the challenged testimony. The only testimony Defendants actually objected to was Agent Whitsett's statement that the term "quarter" could mean a term used by the Vice Lords or a "quarter ounce of crack cocaine." (R. 1871, Trial Tr. Aug. 8, 2013, PageID# 27–28.) They objected to the inference that "quarter" referred to crack cocaine, and requested a continuing objection "so [they] don't have to jump up and down every time this happens." (*Id.* at 28–29.) The district court overruled the objection to Agent Whitsett's testimony about the meaning of "quarter" because Agent Whitsett had two possible interpretations for the phrase and had not determined which of the two meanings he thought was correct. (*Id.* at 29–30.) The district court further instructed Defendants that if a future objection "is exactly like this one, [they] have got a continuing objection," but "it may not be. So don't sit there if [they] have an objection. Go ahead and make it." (*Id.*) Young,

Duncan, and Parnell were clearly instructed to object to any future testimony that was different than the testimony about the meaning of "quarter." They did not object as instructed. Therefore, we review for plain error most of Young's, Duncan's, and Parnell's challenges to the agent's testimony, except for the testimony concerning the meaning of "quarter."

We hold that the district court did not plainly err in admitting Agent Whitsett's testimony because, as the district court noted during trial, "[t]here was enough slang and jargon used that [Agent Whitsett's] testimony as to what they were talking about was necessary and will be helpful to the jury." (R. 1862, Trial Tr. Aug. 21, 2013, PageID# 169.)

In *Freeman*, a murder-for-hire case in which this Court addressed the extent to which agents may give lay opinion testimony that interprets intercepted conversation, we held that the agent's testimony interpreting intercepted phone calls was inadmissible under Rule 701 because the agent "repeatedly relied on the general knowledge of the FBI and the investigation as a whole" when offering his interpretations. 730 F.3d at 596. Unlike the agent who testified in *Freeman*, the agent who testified in this case established a personal knowledge for his testimony. Agent Whitsett testified numerous times to his personal involvement in the investigation since its inception in 2006, as he was the lead agent on the case by the time the wiretap applications were sought, interviewed witnesses, conducted surveillance, and reviewed thousands of hours of phone calls. (R. 1871 at 22–23 (Agent Whitsett noting that he would come in everyday and try to listen to every call that had been recorded, but at some point that became impossible, so he listened to as many as he could).) Thus, we hold that the district court did not plainly err in admitting

Agent Whitsett's testimony interpreting the wiretapped phone calls.

**b. Background Information of Investigation**

Parnell additionally argues that the district court plainly erred by admitting testimony concerning background information about the wiretap and search warrant application process. Parnell concedes that the standard of review is plain error since he did not object to this testimony at trial. We hold that the district court did not plainly err in admitting this testimony.

Agents are permitted to testify regarding how they became involved in a case, what allegations they were investigating, who the suspects were, and similar background information. *Kilpatrick*, 798 F.3d at 381 (citing *United States v. Goosby*, 523 F.3d 632, 638 (6th Cir. 2008)). "This sort of testimony, which is designed to set the stage for the introduction of evidence, differs substantively from problematic 'preview testimony' that 'purports to sum up (in advance of the evidence) the government's overall case.' " *Id.* at 381–82 (citation and internal quotation marks omitted). In *Kilpatrick*, this Court held that the case agent's testimony concerning the allegations she investigated was proper lay opinion testimony because "[s]he did not offer conclusions or impermissibly argue the government's case." *Id.* at 382. "Explaining the allegations underlying an investigation does not implicate Rule 701 or *Freeman*." *Id.*

Specifically, Parnell argues that the prejudicial effect of Agent Whitsett's testimony concerning background information outweighed its probative value under Rule 403. Parnell cites to an out-of-circuit case, *United States v. Cunningham*, 462 F.3d 708 (7th Cir. 2006), which held that the district court abused its discretion by ad-

mitting testimony relating to the procedures used to obtain wiretap authorizations. The Seventh Circuit reasoned that the government agent's testimony about the numerous levels of approval required to obtain the wiretap was irrelevant and unfairly prejudicial because the court permitted the jury to infer that the defendant was engaged in illegal activity before the wiretap since a federal judge, the government attorneys, and federal law enforcement had approved it. *Id.* at 713. However, as the government points out here, the Seventh Circuit has limited *Cunningham*: the impermissible inference from the type of testimony present in *Cunningham* is missing when the government places a wiretap on a phone belonging to someone other than the defendant. *United States v. Recendiz*, 557 F.3d 511, 529 (7th Cir. 2009). "[T]estimony regarding a wiretap on a co-conspirator's telephone permitted a jury to infer that the *co-conspirator* was engaged in illegal activity before the wiretap." *Id.* (citing *United States v. Bustamante*, 493 F.3d 879, 888 (7th Cir. 2007)).

Here, the wiretap was not placed on Parnell's phone. The concern in *Cunningham*, "that the testimony permitted the jury to infer that the defendant was engaged in illegal activity *before* the wiretap because law enforcement, government attorneys, and a district judge each approved it," is not present here. *Recendiz*, 557 F.3d at 529. Rather, the inference that the jury could have drawn from Agent Whitsett's testimony was that Parnell's *co-conspirators* were engaged in illegal activity before the wiretap. *See Bustamante*, 493 F.3d at 888. Accordingly, we find that the district court did not plainly err in admitting Agent Whitsett's background information testimony.

### 3. Co-conspirator Statements

Parnell next argues that the district court erred by admitting co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E). Specifically, Parnell contends that the district court erred by not making any factual or legal findings as to whether the requirements under Rule 801(d)(2)(E) were satisfied.

"To admit statements of a co-conspirator under Rule 801(d)(2)(E), a trial court must find that: (1) the conspiracy existed; (2) the defendant was a member of the conspiracy; and (3) the co-conspirator made the proffered statements in furtherance of the conspiracy." *United States v. Warman*, 578 F.3d 320, 335 (6th Cir. 2009) (citing *United States v. Wilson*, 168 F.3d 916, 920 (6th Cir. 1999)). This is sometimes referred to as an *Enright* finding. *Id.*; *see also United States v. Enright*, 579 F.2d 980, 986–87 (6th Cir. 1978). The district court may "admit the hearsay statements subject to later demonstration of their admissibility by a preponderance of the evidence." *Warman*, 578 F.3d at 335. (citations and internal quotation marks omitted). Whether the government made the necessary showing is a question of fact that this Court reviews for clear error. *United States v. Maliszewski*, 161 F.3d 992, 1007 (6th Cir. 1998) (citation omitted). This Court reviews the district court's legal conclusion regarding admissibility *de novo*. *Id.* (citing *United States v. Carter*, 14 F.3d 1150, 1155 (6th Cir. 1994)).

First, Parnell appears to have made a general objection to the co-conspirator statements being admitted vis-a-vis Duncan's objection that the "proof has failed to show that Mr. Duncan was a part of the alleged conspiracy in this case, and that those calls, other than the calls that obviously captured Mr. Duncan, should be stricken from the record." (R. 1862, Trial Tr. Aug. 21, 2013, PageID# 152; *see also* R. 1871, Trial Tr. Aug. 8, 2013, PageID# 19 (district court granting motion

that an objection by one defendant is an objection by all).) The record indicates that the district court instructed Defendants to object to the statements as the government sought their admission so the court could "have on the record that there are no objections" because that "is the way [the district court] ha[d] been doing it." (R. 1871, Trial Tr. Aug. 8, 2013, PageID# 19–20). But the record indicates that despite this instruction, Parnell did not object to the co-conspirator statements as instructed. Moreover, even if the brief reference by Duncan's counsel preserved Parnell's objections, it preserved them only to the extent that Parnell argued he was not a member of the conspiracy.

Because Parnell challenges all three conspiracy requirements before this Court, the standard of review here is abuse of discretion for Parnell's challenge to the finding that he was a member of the conspiracy, and plain error for the finding that a conspiracy existed and that the statements were made in furtherance of the conspiracy.

■ For a defendant "[t]o be found guilty of conspiracy, the government must prove that [the defendant] was aware of the object of the conspiracy and that he voluntarily associated himself with it to further its objectives." *United States v. Gibbs*, 182 F.3d 408, 421 (6th Cir. 1999) (quoting *United States v. Hodges*, 935 F.2d 766, 772 (6th Cir. 1991)). "A buyer/seller relationship alone is not enough to establish participation in the conspiracy, but further evidence indicating knowledge of and participation in the conspiracy can be enough to link the defendant to the conspiracy." *Gibbs*, 182 F.3d at 421–22.

■ We hold that the district court did not abuse its discretion or plainly err in admitting the co-conspirator statements because the record demonstrated that a conspiracy existed, that Parnell was a member of the conspiracy, and that the statements were made in furtherance of the conspiracy. The district court made factual and legal findings concerning Parnell's membership in the conspiracy in its order denying Parnell's renewed motion for judgment of acquittal and, in the alternative, motion for new trial. The court found "that there was more than sufficient evidence for a reasonable jury to conclude that Parnell was a member of the conspiracy to distribute drugs in Summit Heights." (R. 2003, District Court's Order Den. Parnell's Mot. for J. of Acquittal, PageID# 11.) The court went through the evidence presented by the government and explained why the evidence suggested that Parnell was a member of the conspiracy and that he had more than a mere buyer-seller relationship with other members of the conspiracy. The record also demonstrates that the district court found that a conspiracy existed. (R. 2003 at 15 (finding evidence showed Parnell and Vance "engaged in a joint venture to cook crack cocaine.").) The district court also found that the co-conspirator statements were made in furtherance of the conspiracy. (*Id.* at 10701 (finding conversations with other members of the conspiracy "were not about those individuals' well-being, but conversations relating to those individuals in the sale and cooking of cocaine, and the yields they obtained.").)

Moreover, it was not abuse of discretion or plain error for the district court to make these findings at the close of the trial, as long as it made such findings. *See United States v. Conrad*, 507 F.3d 424, 430 (6th Cir. 2007) (finding district court erred in failing to make requisite findings regarding context and timing of co-conspirators' out-of-court statements before admitting them); *United States v. Fisher*, 22 F.3d 574, 578 (5th Cir. 1994) (stating that district court may defer its Rule

801(d)(2)(E) findings until close of government's case but it is error to omit such findings altogether). Moreover, any error or abuse of discretion was harmless because Parnell failed to demonstrate that any error affected his substantial rights.

### 4. Cooperating Witnesses' Testimony

Parnell further argues that the district court plainly erred in allowing cooperating co-conspirators to testify that they pleaded guilty to offenses in connection with the charged conspiracy when such testimony was elicited on direct examination without a cautionary jury instruction. The government contends that "guilty pleas and convictions may be introduced into evidence if the co-conspirator or co-defendant testifies at trial, so that the factfinder will have appropriate facts on hand to assess the witness's credibility." *Sanders*, 95 F.3d at 454 (citation omitted).

■ We conclude that the district court did not plainly err in allowing this testimony to be presented at trial. The sole case Parnell relies on for this argument, *United States v. Austin*, 786 F.2d 986, 991–91 (10th Cir. 1986), concerns whether the government can question co-conspirators or co-defendants about one of their principal witnesses' prior convictions prior to that witness needing to be impeached or rehabilitated. *Id.* at 991–92. The Tenth Circuit held that "it is the testifying witness' own prior conviction that is admissible on cross-examination to impeach his credibility or on redirect to rehabilitate him." *Id.* at 992. Here, the witnesses were being asked about their own guilty pleas, which this Court permits. *See United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999) ("We have allowed a prosecutor to refer to the plea agreement of a testifying witness. . . . The prosecutor may elicit testimony about its terms, attack the credibility of the witness because of it and even

refer to the plea agreement of a government witness in an attempt to deflect defense counsel's use of the agreement to attack the witness's credibility.").

Moreover, Parnell is entirely incorrect in arguing that the district court did not give a proper cautionary instruction. The district court gave the following instruction:

> You have heard the testimony of witnesses who have plea agreements in which the government has promised him or her that the government may make a recommendation for a lesser sentence and exchange for his or her cooperation. It is permissible for the government to make such a promise. But you should consider such testimony with more caution than the testimony of other witnesses. Consider whether his or her testimony make have been influenced by the government's promise. . . .
>
> You have heard testimony of Demetrius Johnson, Gregory Brooks, and Donnie Patterson. You have also heard that before this trial, each was convicted of a crime. This earlier conviction was brought to your attention only as one way of helping you decide how believable their testimony was. Do not use it for any other purpose. It's not evidence of anything else.

(R. 1889, Jury Instr. Tr., PageID# 216–17) *See also Sanders*, 95 F.3d at 454 ("When a guilty plea or conviction is introduced into evidence, the district court is required to give a cautionary jury instruction to the effect that the jury may use the conviction or guilty plea only to determine the testifying witness's credibility.").

Consequently, we conclude that the district court did not plainly err in permitting this testimony to be presented to the factfinder.

## 5. Physical Evidence

Parnell also argues that the district court erred by admitting physical evidence of firearms, ammunition, magazines, and body armor because this evidence was inflammatory and highly prejudicial, especially since the government also introduced photographs and verbal descriptions of the weapons.

■ As a threshold matter, we conclude that Parnell did not properly preserve this argument for appeal. Prior to trial, Defendants filed a motion *in limine* seeking to exclude the physical evidence of the firearms and ammunition, and other related evidence. At the commencement of trial, the district court declined to rule on the motion *in limine*, and stated that "we're going to have to take it and object as they are about to introduce something. . . . I understand the problem that creates for you, but I don't know another way to do it that's fair." (R. 1894, Trial Tr. Aug. 6, 2013, PageID# 6.) During trial, the court raised this issue *sua sponte* and asked the government why the introduction of this evidence furthers the government's theory. Duncan's counsel stated that he had a "confrontation issue" with the admission of the firearms because they were not found in his client's residence and he was unable to cross-examine the owner of the home where the firearms were found. However, Parnell did not object to the admission of this evidence as he was instructed to do by the district court. "An attorney cannot agree in open court with a judge's proposed course of conduct and then charge the court with error in following that course." *United States v. Sloman*, 909 F.2d 176, 182 (6th Cir. 1990).

■ Because Parnell did not object to this during trial, the standard of review is plain error. We hold that the district court did not plainly err in admitting the physical evidence. First and foremost, the government had to establish the existence of a conspiracy and that Defendants were members of that conspiracy, and firearms, ammunition, body armor, and magazines are relevant evidence in a drug conspiracy trial. *See United States v. Ware*, 161 F.3d 414, 417–18 (6th Cir. 1998) (evidence of an array of firearms "directly supports" the cocaine conspiracy distribution charge against the defendant); *United States v. Medina*, 992 F.2d 573, 582 (6th Cir. 1993) ("[E]vidence of possession of firearms is admissible to prove conspiracy to possess with intent to distribute controlled substances because such possession is ostensibly for the purpose of protecting the efficiency of the drug trafficking enterprise."), *abrogated on other grounds by United States v. Jackson–Randolph*, 282 F.3d 369, 389–90 (2002); *Jennings v. Rees*, 800 F.2d 72, 75 (6th Cir. 1986) (noting that the loaded firearm "could properly have been treated as evidence . . . of the crime of drug trafficking" and that the "loaded handgun may fairly be viewed as a tool of the drug trafficker's trade.").

Even though Parnell argues that none of the firearms that were presented as evidence were his, that fact, alone, does not persuade us. We have held that "a co-conspirator's firearm possession is foreseeable based solely on the quantity of drugs involved only when the quantity of drugs at issue is so large that the participants would expect others to be carrying protection." *United States v. Wade*, 318 F.3d 698, 702 (6th Cir. 2003). Agent Whitsett testified that there were numerous types of firearms, including hand guns, assault rifles, Glocks, pistols, ammunition, bullet proof vests, deposits slips and cash seized totaling tens of thousands of dollars, among other seizures. (*See generally* R. 1873.) The amount of firearms, cash, and drugs seized is similar in size to other situations where we have found firearm

possession to be foreseeable. *See, e.g.,* *United States v. Myers*, 102 F.3d 227, 230, 238 (6th Cir. 1996) (finding foreseeability when defendants had $5,000 cash and co-conspirator stated that the defendants knew of his gun presence); *United States v. Odom*, 13 F.3d 949, 959 (6th Cir. 1994) (agreeing with the Seventh Circuit's observation in *United States v. Diaz*, 864 F.2d 544, 549 (7th Cir. 1988), that "the illegal drug industry is . . . a dangerous, violent business. When an individual conspires to take part in a street transaction involving a kilogram of cocaine worth $39,000, it certainly is quite reasonable to assume that a weapon of some kind would be carried.").

Accordingly, we hold that the district court did not plainly err in admitting the firearms, ammunition, and bullet-proof vests.

### 6. Evidence of Other Crimes Committed in Furtherance of the Conspiracy

Parnell finally argues that the district court erred in admitting evidence of other crimes committed by co-conspirators within the scope of the conspiracy. Specifically, Parnell argues that the testimony describing: (1) violent acts by Porter's co-conspirators; (2) attempts to implicate Parnell in a murder investigation; (3) graphically describing the murder of an individual unconnected to Defendants; and (4) calls suggesting a co-conspirator had committed a drug-related murder, should have been excluded under Federal Rule of Evidence 403 because the testimony was more prejudicial than probative as it implied that Parnell was a dangerous individual and even a potential murderer.

Parnell also cites to *United States v. Arbelaez–Agudelo*, 19 Fed.Appx. 203 (6th Cir. 2001) for the premise that "[b]ad acts by other participants in a common scheme are admissible 'as long as they constitute part of the same criminal episode, whether or not a conspiracy is charged, and as long as independent evidence ties the defendant to that scheme.'" *Id.* at 207 (citing *United States v. Toney*, 161 F.3d 404, 413–14 (6th Cir. 1998)). In *Arbelaez–Agudelo*, this Court found no abuse of discretion or plain error by the district court, in part, because the government reminded the jury during its closing argument that the defendant was not involved in the murder. *Id.* at 207–08.

■ First, there is independent evidence that ties Parnell to the conspiracy, separate and apart from the bad acts committed by the other co-conspirators. For example, Vance and Parnell were worried that they and their fellow gang members were on the verge of being caught by the authorities. On August 6, 2010, Parnell telephoned Vance to warn him about the police "vice truck, the K–9 truck" and how it had pulled someone over on Thompkins Lane. (Appendix A GX 27a.) In another conversation, Vance called Parnell to inform him that he could not come over because he was "too dirty." (Appendix A GX 163a.) Vance and Parnell also discussed enlisting younger individuals to sell the cocaine and crack cocaine for them: "They gotta sell it. They got to." (Appendix A GX 191a.) Vance then stated, "[I]f we fall it's a [w]rap . . . [w]hat they gonna do . . . without me or you?" (*Id.*)

Second, the government made clear that Parnell was not involved in "the shooting, th[e] robbery and any of that part of it." (R. 1908, Trial Tr. Aug. 9, 2013, PageID# 32.) *Cf. Old Chief v. United States*, 519 U.S. 172, 180, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997) (improper grounds for admissions of prior bad acts include generalizing a defendant's prior bad act into bad character and taking that as raising the likelihood he did the bad act now charged).

Third, this evidence helped the government show a connection ·between Porter (the kingpin) and Defendants, and helped to establish the broad conspiracy charged in the operative indictment. One of the phone calls admitted was a recording between Young and Porter ‚in which they were discussing the murder committed by Vance's younger brother, James Farley (a.k.a. Baby James). (*Id.* at 10.) The government sought to admit the recording to establish drug quantities and to establish the connection between Young and Porter. The district court asked Defendants if they would stipulate to the quantity since that is what the government was getting at; however, they would not stipulate as such. Moreover, the government did not end up admitting the actual recording; rather, it elicited a summary of the recording through agent testimony.

Accordingly, we conclude that the district court did not err in admitting evidence of other crimes committed by co-conspirators within the scope of the conspiracy.

Therefore, the district court did not err or abuse its discretion in permitting the six aforementioned evidentiary admissions.

### C. Jury Instructions

Young, Duncan, and Parnell next argue that the district court's failure to demarcate between Agents Whitsett and McClintock's testimony as expert and lay witnesses was plain error.

#### 1. Standard of Review

Young, Duncan, and Parnell did not object to the jury instructions or to the dual role testimony given by case agents Whitsett and McClintock; thus, this Court reviews for plain error. *Lopez–Medina*, 461 F.3d 724, 743 (6th Cir. 2006) (citing *Johnson v. United States*, 520 U.S. 461, 465–66, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997)).

#### 2. Analysis

We hold that the district court plainly erred by not giving the jury an expert witness instruction, but that this error was harmless because it did not affect Young, Duncan, and Parnell's substantial rights.

■■■ This Court has permitted an officer's dual testimony as a fact and expert witness when an adequate cautionary jury instruction was provided. *Lopez–Medina*, 461 F.3d at 743. When an officer is permitted to testify as both a fact witness and an expert witness, we have noted that "both the district court and the prosecutor should take care to assure that the jury is informed of the dual roles of a law enforcement officer as a fact witness and an expert witness, so that the jury can give proper weight to each type of testimony." *Id.* (quoting *United States v. Thomas*, 74 F.3d 676, 683 (6th Cir. 1996), *abrogated on other grounds by General Elec. Co. v. Joiner*, 522 U.S. 136, 143, 118 S.Ct. 512, · 139 L.Ed.2d 508 (1997) (internal quotation marks omitted)). In cases where the district court did not explicitly caution the jury regarding a law enforcement agent's dual role, the jury instructions "have at least included an instruction on how to weigh expert opinion testimony." *Lopez–Medina*, 461 F.3d at 743.

In *United States v. Swafford*, we found no error in permitting a law enforcement officer to give opinion testimony because the jury was instructed as to the following:

> [The agent] was offered as an expert in the area of methamphetamine investigations. An expert witness has special knowledge or experience that allows the witness to give an opinion. You do not have to accept an expert's opinion. In deciding how much weight to give it, you should consider the witness's qualifications and how he reached his conclusions

as well as any other factors you think are relevant to determining whether the expert is a credible witness.

385 F.3d 1026, 1030 (6th Cir. 2004). Similarly, in *United States v. Thomas*, this Court found no abuse of discretion, in part, because the jury was instructed as to the following:

You should consider each expert opinion received in evidence in this case, and give it such weight as you may think it deserves. If you should decide that the opinion of an expert witness is not based upon sufficient education and experience, or if you should conclude that the reasons given in support of the opinion are not sound, or that the opinion is outweighed by other evidence, then you may disregard the opinion entirely.

74 F.3d at 683. In finding no abuse of discretion in *Thomas*, we focused not only on the district court's cautionary instruction, but also on the fact that the prosecutor demarcated the transition between the examination of the agent as a fact witness and questions relating to his role as an expert witness. 74 F.3d at 683.

Moreover, in *United States v. Tocco*, we found no abuse of discretion because, in addition to the existence of a cautionary "dual role" jury instruction, the case agent's "dual roles were emphasized to the jury by the fact that he testified at two different times—once early in the trial as a fact witness, and again at the conclusion of trial as an expert witness." 200 F.3d 401, 419 (6th Cir. 2000).

In *Lopez–Medina*, the government agents testified as both expert and fact witnesses. 461 F.3d at 744. The trial court gave an instruction stating that the government agents' testimony "is not entitled to any greater weight," and that "it is quite legitimate for defense counsel to try to attack the credibility of a law enforcement agent witness on the grounds that

his or her testimony may be colored by a personal or professional interest in the outcome of the case." *Id.* (citation and internal quotation marks omitted). We held that:

This instruction, however, does not address the particular concerns that may arise when an officer gives expert opinion testimony. A general instruction on weighing officer testimony does not guard against a jury mistakenly weighing opinion testimony as if the opinion were fact, nor does it instruct the jury that they are free to reject the opinions given.

*Id.* Because the lower court did not give an instruction on expert testimony, or an instruction on the agents' dual role as fact and expert witnesses, this Court, in finding that the district court committed plain error, concluded that "the jury instruction given was insufficient to guard against the risk of confusion inherent when a law enforcement agent testifies as both a fact witness and as an expert witness." *Id.*

Here, the district court gave the jury an instruction specific to opinion testimony and testimony given by law enforcement officers:

You have heard testimony of several witnesses who testified about their opinions. You do not have to accept those opinions. In deciding how much weight to give them, you should consider the witness' qualifications and how he reached his conclusions. Also consider the other factors discussed in these instructions for weighing credibility of witnesses. Remember that you alone decide how much of a witness' testimony to believe and how much weight it deserves.

People employed by the federal, state, or local government, including law enforcement officers, do not stand in any

higher station in the community than other persons, and their testimony is not entitled to any greater weight. You shall recall their demeanor on the stand, their manner of testifying, the substance of their testimony, and the weight and balance—and weight and balance it just as carefully as you would the testimony of other witnesses.

(R. 1889, Trial Tr. Aug. 22, 2013, PageID# 216–17.)

The government concedes that Agents Whitsett and McClintock presented both fact and opinion testimony. However, the district court did not qualify Agents Whitsett and McClintock as expert witnesses under Federal Rule of Evidence 702, nor did Young, Duncan, and Parnell request such designations.

 The salient issue before us is whether the district court plainly erred in not giving an expert witness instruction, but instead giving a general instruction on weighing opinion testimony and a cautionary instruction on weighing law enforcement testimony, when the agents were not qualified as experts but gave expert opinion testimony. We conclude that the district court plainly erred in failing to give an expert witness instruction.

In *Lopez–Medina*, we found plain error because the lower court failed to give a cautionary expert jury instruction when law enforcement agents testified as both fact and expert witnesses. Additionally, in *Lopez–Medina*, we found that the agents possessed "obvious qualifications," and thus no abuse of discretion occurred in the district court's failure to qualify the witnesses formally before allowing their expert testimony. *Id.* at 743. Likewise, in *United States v. Neeley*, 308 Fed.Appx. 870, 872 (6th Cir. 2009), the law enforcement agents gave a combination of expert opinion and fact testimony, although neither was formally qualified by the lower

court as an expert. We found error in *Lopez–Medina* for not giving an expert witness instruction, and we found no error in *Neeley* for giving an expert witness instruction and a general instruction on witness credibility.

In *Lopez–Medina*, the instruction given to the jury included language stating that the testimony of government agents "is not entitled to any greater weight." 461 F.3d at 744. Part of our reasoning in *Lopez–Medina* for finding error was that a "general instruction on weighing officer testimony does not guard against a jury mistakenly weighing opinion testimony as if the opinion were fact, nor does it instruct the jury that they are free to reject the opinions given." *Id.* at 744. In *Neeley*, the expert opinion instruction informed the jury that they did not have to accept the expert's opinion. 308 Fed.Appx. at 879.

Here, the district court expressly instructed the jury that they "do not have to accept those opinions," and that the jury "alone decide[s] how much of a witness' testimony to believe and how much weight it deserves." (R. 1889 at 216.) Similar to *Neeley*, the lower court in this matter gave a general opinion instruction informing the jury that they did not have to accept the opinion testimony, in addition to an instruction on law enforcement testimony.

Despite this inclusion, we hold that the district court plainly erred by not giving the jury a dual role witness instruction. The agents' testimony lacked any clear demarcation between expert and fact witness roles, which is similar to the agents' testimony in *Lopez–Medina*, 461 F.3d at 744. The government does not repudiate this contention, nor does the voluminous record demonstrate that the two types of testimony were separated. In *Thomas* and *Tocco*, this Court found that, in addition to the cautionary jury instruction, the dual

roles of the agents were emphasized by the fact that the agents testified at different times—first as fact witnesses, and then as expert witnesses. *Thomas*, 74 F.3d at 683; *Tocco*, 200 F.3d at 419.

Because there was no proper cautionary instruction given regarding the agents' dual roles or a clear demarcation between their fact testimony and expert opinion testimony, we find that the district court committed an error that was plain or obvious in permitting the dual role testimony. *See Lopez–Medina*, 461 F.3d at 745 (holding same).

 Although Defendants demonstrated that the district court's failure to give a cautionary jury instruction was plain error, the error was harmless because it did not affect Defendants' substantial rights. "An effect on substantial rights is typically established through a showing of an actual effect on the outcome of the case." *Lopez–Medina*, 461 F.3d at 745 (citation omitted). In *Lopez–Medina*, we determined that the defendant made such a showing because the failure to give a cautionary "dual role" jury instruction, in addition to the other evidentiary errors, likely affected the outcome of the trial. *Id.* In circumstances where the only evidentiary error is the failure to provide the cautionary "dual role" jury instruction, we have not determined that the error seriously affected the fairness, integrity, or public reputation of the proceedings. *See United States v. Martin*, 520 F.3d 656, 659–60 (2008) (holding that the lack of a cautionary instruction for an officer's dual role testimony, although erroneous, did not seriously affect the fairness, integrity, or public reputation of the proceedings in the absence of other evidentiary errors). Here, there were no other evidentiary errors. Therefore, Young, Duncan, and Parnell cannot establish an effect on their substantial rights.

Accordingly, the district court erred by not giving a dual role jury instruction, but that that error was harmless because it did not affect their substantial rights.

### D. 21 U.S.C. § 851 Informations

Duncan, Young, and Parnell argue that the filing of the § 851 informations violated their Fifth Amendment rights to due process because it was an act of prosecutorial vindictiveness motivated by a desire to punish them for going to trial.

### 1. Preservation of the Issue

 As a threshold matter, we find that Young and Parnell did not preserve their § 851 and Eighth Amendment arguments for appeal because they did not raise these arguments before they filed their notices of appeal. Duncan timely asserted his § 851 and Eighth Amendment challenges in district court prior to filing his notice of appeal.

 Young and Parnell attempted to join in Duncan's motion challenging his § 851 information and sentence; however, Young and Parnell moved to join after they had filed their notices of appeal. A notice of appeal divests the district court of its control over aspects of the case involved in the appeal. *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58, 103 S.Ct. 400, 74 L.Ed.2d 225 (1982) (noting that filing of notice of appeal confers jurisdiction on court of appeals and divests district court of control over aspects of case involved in appeal, but notice of appeal from unappealable order does not divest district court of jurisdiction) (citations omitted).

Thus, we hold that Young and Parnell did not preserve their § 851 and Eighth Amendment arguments for appeal, while Duncan did preserve those arguments. We now turn to the issue of the proper stan-

dard of review for the § 851 informations challenge.

## 2. Standard of Review

Because it was preserved for appeal, the proper standard of review for Duncan's § 851 challenge is abuse of discretion. The proper standard of review for Young and Parnell's § 851 challenges is plain error because they were not preserved. *See Meda*, 812 F.3d at 510 (stating that if motion to dismiss indictment for prosecutorial vindictiveness is untimely, standard of review is plain error); *United States v. LaDeau*, 734 F.3d 561, 565 (6th Cir. 2013) (concluding that decision whether to dismiss indictment for prosecutorial vindictiveness is reversible only if district court abused its discretion); *United States v. Suarez*, 263 F.3d 468, 476 (6th Cir. 2001) (citation omitted).

 " 'A district court abuses its discretion when [it] relies on erroneous findings of fact, applies the wrong legal standard, misapplies the correct legal standard when reaching a conclusion, or makes a clear error of judgment.' " *Randleman v. Fidelity Nat'l Title Ins. Co.*, 646 F.3d 347, 351 (6th Cir. 2011) (citation omitted). Where the district court's decision to dismiss hinges upon factual findings, we defer to the district court's decision unless the findings upon which it was predicated are clearly erroneous. *See LaDeau*, 734 F.3d at 566 (citation omitted).

## 3. Analysis

We hold that the district court did not plainly err or abuse its discretion in denying Young, Parnell, and Duncan's motions to strike the § 851 informations because increased charges resulting from a breakdown of the plea bargaining process is not a violation of their Fifth Amendment right to due process.

 "To punish a person because he has done what the law plainly allows him to do is a due process violation 'of the most basic sort.' " *United States v. Goodwin*, 457 U.S. 368, 372, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982) (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 363, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978)). "A showing of vindictive prosecution requires (1) an exercise of a protected right; (2) a prosecutorial stake in the exercise of that right; (3) unreasonableness of the prosecutor's conduct; and (4) the intent to punish the defendant for exercise of the protected right." *Meda*, 812 F.3d at 510 (citation omitted). Due process protects against prosecutorial retaliation for a defendant's exercise of a statutory or constitutional right. *United States v. Poole*, 407 F.3d 767, 774 (6th Cir. 2005) (citing *Goodwin*, 457 U.S. at 372, 102 S.Ct. 2485). "[T]he Due Process Clause is not offended by all possibilities of increased punishment ..., [ ] only by those that pose a realistic likelihood of vindictiveness." *United States v. Roach*, 502 F.3d 425, 443 (6th Cir. 2007) (quoting *Blackledge v. Perry*, 417 U.S. 21, 27, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974)).

Defendants raise an almost identical argument to one that was raised in *United States v. Zolicoffer*, 570 Fed.Appx. 540, 543–44 (6th Cir. 2014). In that case, the defendant argued that the prosecutor's filing of the § 851 information regarding his prior felony drug conviction was an act of prosecutorial vindictiveness to punish him for not accepting the plea bargain. *Id.* at 543. Because the defendant did not raise the issue in the district court, this Court reviewed for plain error. *Id.* We stated that:

> To show "actual vindictiveness," a defendant must show "objective evidence that a prosecutor acted in order to punish the defendant for standing on his legal rights," [ ] or present sufficient evidence

to create a "presumption of vindictiveness" by examining the "realistic likelihood of vindictiveness" and focusing "on the prosecutor's 'stake' in deterring the exercise of a protected right and the unreasonableness of his actions."

*Id.* (quoting *United States v. Dupree*, 323 F.3d 480, 489 (6th Cir. 2003)).

 Young, Duncan, and Parnell have made threadbare allegations of prosecutorial vindictiveness. Defendants have not presented any direct or objective evidence to show that the prosecutor acted vindictively. *See Zolicoffer*, 570 Fed.Appx. at 543. Nor have Defendants presented evidence sufficient to raise a presumption of vindictiveness.

 First, Defendants have not shown how the prosecutor had any special stake in the proceeding beyond getting Defendants to plead guilty. *See Dupree*, 323 F.3d at 489 ("[T]he [Supreme] Court has necessarily accepted as constitutionally legitimate the simple reality that the prosecutor's interest at the bargaining table is to persuade the defendant to forego his right to plead not guilty.") (quoting *Bordenkircher*, 434 U.S. at 364, 98 S.Ct. 663). "[A]voidance of trial as a prosecutorial stake is implicit in the plea bargaining process, and therefore exempt under *Bordenkircher* from being held vindictive." *Suarez*, 263 F.3d at 480.

Second, Defendants have not shown how the prosecutor acted unreasonably in filing the § 851 enhancements. Defendants argue that the only three defendants who went to trial, i.e., Young, Duncan, and Parnell, were slammed with these enhancements right before trial. But this, alone, does not raise an inference of misconduct. For one, the prosecutor timely filed the informations. *See* 21 U.S.C. § 851(a)(1) (requires filing before trial or before entry of a plea of guilty). Before the first scheduled trial date in August 2012,

the government filed § 851 informations for Duncan, Young, and Parnell, noting that each had prior felony drug convictions and that, if convicted of the drug conspiracy charge, each faced a mandatory sentence of life imprisonment.

Third, § 851 does not compel the government to file the information in every case. Prosecutors have discretion. *United States v. Branham*, 97 F.3d 835, 848 (6th Cir. 1996) (noting that § 851 created prosecutorial discretion). Fourth, the government filed § 851 informations for seven other co-defendants, not including Young, Duncan, and Parnell. (*See* R. 1110 (Donald Ewing), 1111 (Dominique Simons), 1113 (Xavier Parnell), 1165 (Dontrell Pittman), 1385 (Robert Porter), 1389 (Robert Porter), 1445 (Ray Ozen), 1898 (Derrick Campbell).) Co-defendants Ewing, Simons, and Xavier Parnell's § 851 informations were filed the same day as Alto Parnell's first § 851 information, August 3, 2012. Co-defendant Pittman's § 851 information was filed the same day as Duncan's first information, August 27, 2012, and Young's first information was filed August 16, 2012. Robert Porter's information was filed April 9, 2013, and Ray Ozen's was filed April 23, 2013.

The record does not support an inference of prosecutorial vindictiveness. If the government had filed § 851 informations only for the three defendants who went to trial, then an inference of prosecutorial vindictiveness may have been suggested. However, that is not the case here. Accordingly, we conclude that the district court did not abuse its discretion or plainly err in declining to strike Young, Parnell, and Duncan's § 851 informations.

### E. Eighth Amendment Challenge

#### 1. Standard of Review

 We review *de novo* a constitutional challenge to a district court's sentence.

*United States v. Kelsor*, 665 F.3d 684, 701 (6th Cir. 2011); *see also United States v. Jones*, 569 F.3d 569, 573 (6th Cir. 2009). However, this Court reviews for plain error an unpreserved claim that a sentence is cruel and unusual. Fed. R. Crim. P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to court's attention"); *see also United States v. Ervin*, 266 Fed. Appx. 428, 437 (6th Cir. 2008).

We review *de novo* Duncan's timely constitutional challenge to his sentence, and review for plain error Young and Parnell's untimely challenge to their sentences. *See Kelsor*, 665 F.3d at 701; *Ervin*, 266 Fed. Appx. at 437.

### 2. Analysis

██ Young, Parnell, and Duncan argue that their sentences are not proportionate to the crimes for which they were convicted, and therefore, their sentences violate the Eighth Amendment's prohibition on cruel and unusual punishment. The convictions relevant to Duncan, Young, and Parnell's Eighth Amendment challenge are the drug conspiracy and possession of controlled substances near public housing authority convictions, Counts One and Four, because those convictions triggered mandatory terms of life imprisonment for felons with two or more felony drug convictions.

This Court adheres to the "narrow proportionality principle" for evaluating Eighth Amendment claims articulated in *Harmelin v. Michigan*, 501 U.S. 957, 996–97, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (Kennedy, J., concurring). *See United States v. Graham*, 622 F.3d 445, 452 (6th Cir. 2010); *United States v. Hill*, 30 F.3d 48, 50–51 (6th Cir. 1994). A plurality in *Harmelin* rejected the claim that the Eighth Amendment required strict proportionality and concluded that it prohibited only "extreme sentences that are 'grossly disproportionate' to the crime." 501 U.S. at 1001, 111 S.Ct. 2680. Applying this principle, the Supreme Court upheld Michigan's penalty of mandatory life sentence without the possibility of parole for possession of more than 650 grams of cocaine, and rejected the defendant's assertion that his sentence of life imprisonment without parole was grossly disproportionate to the crime since he was a first-time felony offender in possession of 650 grams of cocaine. *Id.*

This Court also upheld a defendant's mandatory life sentence for a conspiracy conviction to distribute and possess more than 1,000 grams of heroin pursuant to 21 U.S.C. § 841(b)(1)(A). *See Kelsor*, 665 F.3d at 700–01. In *Kelsor*, like the instant matter, "[t]he government had filed an information pursuant to § 851 identifying a number of prior convictions as the basis for statutorily enhanced penalties." *Id.* at 691. The *Kelsor* Court further held that "[t]o the extent that defendant asserts a lack of proportionality between himself and others convicted of similar offenses, this [C]ourt held that comparative proportionality is not mandated by the Constitution." *Id.* at 701 (citing *United States v. Layne*, 324 F.3d 464, 474 (6th Cir. 2003)).

In like manner, we have held that imposition of a life sentence without parole for a third felony drug conviction pursuant to § 841(b)(1)(A)(iii) is not "grossly disproportionate" to the crime. *See Hill*, 30 F.3d at 50–51. Likewise, in *Jones*, 569 F.3d at 574, we upheld the defendant's ten-year sentence for a conviction of possession with intent to distribute fifty grams or more of cocaine base, and rejected the defendant's argument that his history as an adult was relatively crime free and that he scored just one criminal history point. Moreover, in *United States v. Wimbley*, 553 F.3d 455, 463 (6th Cir. 2009), we re-

jected a defendant's argument that his life sentence, as mandated by § 841(b)(1)(A), was cruel and unusual because he did not attempt to distinguish his case from *Hill*. *See also United States v. Caver*, 470 F.3d 220, 247 (6th Cir. 2006) (rejecting as meritless an Eighth Amendment claim that failed to differentiate *Hill*).

Defendants cite *United States v. Young*, 766 F.3d 621 (6th Cir. 2014), for the general proposition that "[a] defendant's particular circumstances are relevant to an as-applied Eighth Amendment claim and could render a sentence unconstitutional." *Id.* at 626 (citing *Graham v. Florida*, 560 U.S. 48, 59, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010)). In *Young*, the defendant was sentenced to a mandatory 15–year term for being a felon in possession of ammunition under the Armed Career Criminal Act ("ACCA"). *Id.* at 622. The defendant was found with seven shotgun shells that he had acquired while helping a neighbor sell her late husband's possessions. *Id.* at 623. We held that his Achilles heel was his recidivism, which included four counts of burglary and seven counts of aggravated burglary. *Id.* at 627–28. We went through sentences for recidivist offenders, and stated that "the line is different." *Id.* at 628. For example, a life sentence for a recidivist felon who passed a bad check was too harsh, *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), while a twenty-five-year sentence is not too harsh for a recidivist felon who stole $1,200 worth of merchandise, *Ewing v. California*, 538 U.S. 11, 123 S.Ct. 1179, 155 L.Ed.2d 108 (2003), and a fifteen-year sentence is not too harsh for a recidivist felon who possessed a firearm while beating his girlfriend, *United States v. Moore*, 643 F.3d 451 (6th Cir. 2011). *Young*, 766 F.3d at 628. We ultimately held that the defendant's sentence was not grossly disproportionate to his crime under *Ewing* and *Solem. Id.*

Defendants' Eighth Amendment claims fare no better than the defendants' parallel claims mentioned above. Defendants do not attempt to distinguish their case from *Hill, Kelsor, Wimbley, Jones*, or *Caver*, which are relevant to this appeal. Moreover, Defendants' citation to *Young* is not helpful to their argument, since the *Young* Court found his sentence constitutional. Moreover, the *Young* defendant was not sentenced pursuant to the conspiracy statute under which Defendants were sentenced here, nor was he charged with the same crimes as Defendants here.

Likewise, the Supreme Court cases to which Defendants cite are not germane to their arguments. *See Miller v. Alabama*, 567 U.S. 460, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012) (holding that mandatory life imprisonment without parole for those under the age of eighteen at the time of their crimes violates the Eighth Amendment's prohibition on cruel and unusual punishments); *Graham* (holding that the imposition of life without parole sentence on juvenile offender who did not commit homicide violates the Eighth Amendment's prohibition on cruel and unusual punishments). *Young* attempts to differentiate his situation from those of his co-defendants and compares his situation to those of the juveniles in *Miller* and *Graham. Young* argues that because he was a 22–year old "juvenile" when he committed the offenses at issue, we should take his particular circumstance into account and follow the Supreme Court's line of reasoning in *Miller* and *Graham* to overturn his interminable life sentence. *Young's* "juvenile" argument contravenes the precedent set by the Supreme Court and this Court.

Applying the narrow proportionality principle of *Harmelin*, and in light of the Supreme Court and this Court's precedent, this case does not present the same kind of

"extreme disparity between the sentence imposed and the crime committed that would offend the Eighth Amendment." *Jones*, 569 F.3d at 574. Because this Court has previously upheld a mandatory life sentence without parole for a defendant convicted of conspiracy to distribute cocaine base and found that the sentence was not grossly disproportionate to the offense committed, the sentences handed down are not so grossly disproportionate as to violate the Eighth Amendment. *See Hill*, 30 F.3d at 50–51. Therefore, the district court did not err in sentencing Young, Parnell, and Duncan.

## F. Parnell's Sentencing Challenge

Parnell challenges the imposition of his sentence on three additional grounds, separate and apart from the Fifth and Eighth Amendment grounds mentioned above. Parnell argues that the district court plainly erred because: (1) it sentenced him to a term of life imprisonment on Count One without submitting to the jury the amount of drugs attributable to his participation in the offense; (2) sentenced him to a term of life imprisonment on Count Four without submitting to the jury the amount of drugs involved in the offense; and (3) failed to submit evidence of Parnell's prior drug convictions to a jury.

### 1. Standard of Review

We review Parnell's sentencing challenge for plain error because Parnell did not preserve his arguments related to his sentencing, as discussed above. *See United States v. Mack*, 729 F.3d 594, 607 (6th Cir. 2013).

### 2. Analysis

#### a. Count One

Parnell first argues that the district court plainly erred because it sentenced him to a term of life imprisonment on Count One without submitting to the jury the amount of drugs attributable to his participation in the offense. Parnell contends that because the mandatory minimum sentence imposed depends upon the amount of narcotics involved in the offense, the amount of narcotics is an element of 21 U.S.C. § 841 that must be submitted to the jury and proven beyond a reasonable doubt. The government argues that the district court did not plainly err by determining the quantity of cocaine involved in the conspiracy, as a whole, and Parnell's prior felony drug convictions triggered a mandatory life sentence under § 841(b)(1)(A).

Parnell was convicted of conspiracy to possess with intent to distribute cocaine and crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. The jury determined that the drug conspiracy as a whole involved 500 grams or more of cocaine and 280 grams or more of cocaine base. Section 841(a)(1) states that "it shall be unlawful for any person knowingly or intentionally" to "manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." Section 846 states that "[a]ny person who attempts or conspires to commit any offense defined · in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

Title 21 U.S.C. § 841(b)(1)(A) states that "any person who violates subsection (a) of this section" "[i]n the case of a violation of subsection (a) of this section involving" "280 grams or more of a mixture or substance ... which contains cocaine base" ... "after two or more prior convictions for a felony drug offense" "shall be sentenced to a mandatory term of life imprisonment without release." Section 841(b)(1)(A) goes on to state that "[n]o

person sentenced under this subparagraph shall be eligible for parole during the time of imprisonment imposed therein."

Parnell argues that our holding in *United States v. Pruitt*, 156 F.3d 638 (6th Cir. 1998), compels us to find that he is not culpable for the quantity of controlled substances attributable to the conspiracy as a whole, but only the amount attributable to him. Parnell's argument fails to persuade us, as we addressed this same argument in *United States v. Robinson*, 547 F.3d 632 (6th Cir. 2008). As we noted in *Robinson*, the issue in *Pruitt* was "whether a conspiracy involving multiple overt acts is nonetheless a violation of § 841(a) such that the drug quantities from those multiple acts can be aggregated for sentencing under 21 U.S.C. § 841(b)(1)(A)." 547 F.3d at 638 (citation and internal quotation marks omitted). The *Pruitt* Court held that drug quantities from multiple overt acts committed in furtherance of a conspiracy can be aggregated for sentencing purposes. *Robinson*, 547 F.3d at 638. Thus, we have "interpreted 21 U.S.C. § 841(b)(1)(A) to focus on the threshold quantity involved in the entire conspiracy." *Id.* The *Robinson* Court explained that "[a]lthough a 'small-time' drug seller may not be responsible for all the transactions or actions of his associates, he is responsible for the conspiracy in which he participated." *Id.* at 639. We also recognized that § 841(b)(1)(A) prescribes mandatory sentences for conspiracy convictions involving certain threshold amounts of drugs. *Id.* (citation omitted).

The government asserts that we have been inconsistent in addressing whether mandatory minimum sentences for § 846 drug conspiracy offenses are determined by conspiracy-wide or defendant-specific

drug quantities.[3] (*See* Appeal R. 97, Gov't's Rule 28(j) Notice of Suppl. Authorities.) The government contends that *Robinson* is inconsistent with *United States v. Swiney*, 203 F.3d 397 (6th Cir. 2000), because *Swiney* held that an individualized approach, as articulated in the Sentencing Guidelines, determines the statutory range, whereas *Robinson* holds that a conspiracy-wide drug quantity determines the statutory penalty range.

The government also asserts that our decision in *United States v. Watson*, 620 Fed.Appx. 493, 509 (6th Cir. 2015) incorrectly reconciled *Robinson* and *Swiney*. The defendants in *Watson* were convicted of conspiracy to distribute controlled substances in violation of § 846 and were sentenced pursuant to § 841(b)(1)(A) and § 841(b)(1)(B). The defendants were sentenced to mandatory minimums due to the quantity of drugs attributable to the individual defendants and all reasonably foreseeable quantities of contraband that were within the scope of the conspiracy. *Id.* at 513. One of the defendants was sentenced to mandatory life imprisonment because of two prior felony drug convictions based on a § 851 information. The *Watson* Court reconciled *Swiney* and *Robinson* by stating that "[the] [*Swiney*] opinion—which stated 'that *Pinkerton* principles, as articulated in the relevant conduct guidelines, U.S.S.G. § 1B1.3(a)(1)(B), determine whether a defendant convicted under 21 U.S.C. § 846 is subject to penalty set forth in 21 U.S.C. § 841(b)(1)(C)'—concerns sentencing under the Guidelines." *Id.* at 509. The *Watson* Court went on to state that "[a] different standard of foreseeability applies in that context to the standard applicable to the drug quantity finding for

---

**3.** The government also mentions that it has adopted a defendant-specific approach to

charging future drug conspiracies.

§ 846 purposes, which *Robinson* discusses." *Id.*

After reviewing *Swiney*, *Robinson*, and *Watson*, we find that regardless of which approach we apply to Parnell's sentence, the outcome is the same. Thus, there is no need for us to reconcile these cases at this time. Under the individual approach, " '[w]here a defendant is part of a jointly undertaken criminal activity involving drugs, the defendant is accountable for all quantities of contraband with which [he] was directly involved and . . . all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that [he] jointly undertook.' " *Watson*, 620 Fed.Appx. at 513 (quoting *United States v. Begley*, 602 Fed.Appx. 622, 626 (6th Cir. 2015) (quoting U.S.S.G. § 1B1.3 cmt. 2) (internal quotation marks omitted)). A "jointly undertaken criminal activity" includes a conspiracy. *Id.*

We "must accept a district court's determination of the quantity of drugs attributable to a defendant for sentencing purposes unless that determination was clearly erroneous." *United States v. Dillard*, 505 Fed.Appx. 516, 520 (6th Cir. 2012) (citing *United States v. Jeross*, 521 F.3d 562, 570 (6th Cir. 2008)). "If the exact amount of drugs is undetermined, 'an estimate will suffice but . . . a preponderance of the evidence must support the estimate.' " *Jeross*, 521 F.3d at 570 (quoting *United States v. Walton*, 908 F.2d 1289, 1302 (6th Cir. 1990)); *see also United States v. Gardner*, 417 F.3d 541, 546–47 (6th Cir. 2005). "[A] district court's approximation of drug quantity is not clearly erroneous if it is supported by competent evidence in the record." *Jeross*, 521 F.3d at 570 (citing *United States v. Brannon*, 7 F.3d 516, 520 (6th Cir. 1993)).

Under this individual-defendant approach, we find that the district court did not err in sentencing Parnell to life imprisonment for Count One because the quantity of cocaine and crack cocaine required for a conviction under Count One were within the scope of the conspiracy of which Parnell was a part and was reasonably attributable to Parnell. The evidence presented at trial demonstrated that Parnell knew Vance, Parnell's usual supplier, and obtained his supply from Porter, the kingpin of the drug conspiracy who trafficked kilograms of cocaine. On August 27, 2010, Vance told Parnell over an intercepted telephone conversation that he obtained his drugs from Porter, and Parnell responded that he had "figured that." (Appendix A GX 73a.) Moreover, Parnell expressed concern that he and his fellow gang members were on the verge of being caught by the authorities. On August 6, 2010, Parnell telephoned Vance to warn him about the police "vice truck, the K–9 truck" and how it had pulled someone over on Thompkins Lane. (Appendix A GX 27a.) In another conversation on October 9, 2010, Vance called Parnell to inform him that he could not come over because he was "packed" and "too dirty." (Appendix A GX 163a.) Parnell was also concerned with the manufacturing of the crack cocaine from powder cocaine. For instance, in that same October 9, 2010 conversation, Parnell asked Vance how he did, or how he "pull[ed]" last night," and Vance responded that he "had nothing but a quarter," and that he "put 21 in and got 19, the shit look like [ ] if you crush it up it look . . . real funny, crunchy looking but it jumped though . . . and the powder real real hard." (*Id.*)

Parnell also discussed how law enforcement arrested other members of the conspiracy and admitted that they "almost caught [Parnell] walking out of Toya's crib [ ] with an ounce of powder on [him]." (Appendix A GX 191a.) Parnell also discussed with Vance that they should enlist

younger individuals to sell the cocaine and crack cocaine for them: "They gotta sell it. They got to." (*Id.*) Vance then stated, "[I]f we fall it's a [w]rap ... [w]hat they gonna do ... without me or you?" (*Id.*) These conversations established that Parnell knew his supplier, Vance, received cocaine from Porter, knew that Vance manufactured crack cocaine, knew that other gang members were being arrested by law enforcement for possessing drugs, and it was reasonably foreseeable to someone in Parnell's position that Porter, Vance, and the other gang members would have possessed over the course of the conspiracy over 500 grams of cocaine and over 280 grams of crack cocaine.

Accordingly, the district court did not plainly err in sentencing Parnell to life imprisonment on Count One.

### b. Count Four

Parnell next argues that the district court plainly erred by sentencing him to a term of life imprisonment on Count Four without submitting to the jury the amount of drugs involved in the offense. The government contends that it did not matter whether the jury determined the amount of drugs involved because mandatory life imprisonment under § 841(b)(1)(A) is triggered by two prior felony drug convictions and violations of §§ 841(a)(1) and 860, which prohibits possession of a detectable amount of cocaine or crack cocaine within 1,000 feet of a public housing area with intent to distribute. Specifically, the government asserts that § 860 provides for mandatory life imprisonment for violations of § 841(a) if the offender has two prior felony convictions.

Parnell was convicted of possessing a detectable amount of cocaine and cocaine base within 1,000 feet of a public housing area with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 860. Section 860 states that for "[a]ny person who violates section 841(a)(1) of this title ... by distributing, possessing with intent to distribute, or manufacturing a controlled substance in or on, or within one thousand feet of ... [a] housing facility owned by a public housing authority" "[p]enalties for third and subsequent convictions shall be governed by section 841(b)(1)(A) of this title." 21 U.S.C. § 860(b). The jury found Parnell guilty of possessing *a detectable amount of cocaine and cocaine base* within 1,000 feet of a public housing authority. Section 860 does not require a separate finding by the jury of a certain quantity of controlled substances. Section 860 expressly states that a person shall violate it if he or she possesses "a controlled substance" within 1,000 feet of a public housing authority. *Id.*

The jury found Parnell to have a detectable amount of *a controlled substance* on his person when he was within 1,000 feet of a housing facility owned by a public housing authority. Because Parnell has two prior felony convictions, his § 860 conviction is governed by section 841(b)(1)(A), which mandates a mandatory term of life imprisonment. Section 841(b)(1)(A) specifies that a violation of § 860 mandates that a person who has two or more felony drug convictions be sentenced to a term of life imprisonment without parole.

Thus, the district court did not err because the jury was not required to find a certain quantity of a controlled substance on Parnell, insofar as they found him to possess "a controlled substance."

### c. Prior Convictions

Finally, Parnell avers that the district court plainly erred in failing to submit evidence of Parnell's prior drug convictions to a jury. Parnell specifically argues that the district court, in accordance with 21 U.S.C. § 851 and the Supreme Court's de-

cision in *Almendarez–Torres*, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), sentenced Parnell to two mandatory concurrent terms of life imprisonment for Counts One and Four, even though *Almendarez–Torres* is irreconcilable with the Supreme Court's holding in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Alleyne v. United States*, —— U.S. ——, 133 S.Ct. 2151, 186 L.Ed.2d 314 (2013). The government responds that this Court is bound by *Almendarez–Torres*, which held that a fact of a prior conviction need not be submitted to a jury, because it is still good law and will remain so until the Supreme Court overrules it.

Parnell's last argument has been expressly rejected by this Court. We have held that *Apprendi* preserved the Supreme Court's earlier ruling in *Almendarez–Torres*. *United States v. Nagy*, 760 F.3d 485, 488 (6th Cir. 2014). In *Almendarez–Torres*, the Supreme Court held that the Sixth Amendment does not require the government to set forth in the indictment and prove beyond a reasonable doubt the fact of a prior conviction. 523 U.S. at 228–29, 118 S.Ct. 1219. In *Alleyne*, the Supreme Court held that any fact increasing the mandatory minimum sentence for a crime is an element of that crime, not a sentencing factor, and therefore, the element must be submitted to the jury for determination. 133 S.Ct. at 2155, 2160 n.1. The analysis of *Alleyne* "springs from *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), where the Court held the Sixth Amendment requires any fact that increases the penalty for a crime beyond the prescribed statutory maximum sentence, other than the fact of a prior conviction, must be submitted to the jury and proved beyond a reasonable doubt." *Mack*, 729 F.3d at 607. In *Alleyne*, the Supreme Court explicitly declined to overrule *Almendarez–Torres'*

narrow exception to this general rule for the fact of a prior conviction. *Id.* at 609.

We have repeatedly addressed and rejected arguments identical to Parnell's. "Nagy's contention that the holding in *Almendarez–Torres* has been 'whittled away,' and that '*Almendarez–Torres* has been overruled by implication,' and is 'no longer good law,' is unavailing." *Nagy*, 760 F.3d at 488. "*Almendarez–Torres* is still good law and will remain so until the Supreme Court explicitly overrules it." *United States v. Anderson*, 695 F.3d 390, 398 (6th Cir. 2012) (citation omitted). "Although *Almendarez–Torres* may stand on shifting sands, the case presently remains good law and we must follow it until the Supreme Court expressly overrules it." *Mack*, 729 F.3d at 609. In *United States v. Pritchett*, 749 F.3d 417, 434 (6th Cir. 2014), we reiterated that *Almendarez–Torres* has not been overruled: "*Alleyne* did not disturb the holding in *Almendarez–Torres*." Parnell's challenge is without merit. Therefore, we hold that the district court did not err in sentencing Parnell.

## G. Vance's Sentencing Challenge

Finally, Vance argues that his sentence was unreasonable because: (1) the district court erred in failing to adequately consider the factors set forth in 18 U.S.C. § 3553(a); (2) the district court erroneously relied on the 18–to–1 cocaine to crack cocaine ratio in U.S.S.G. § 2D1.1(c) and rejected Vance's policy-based argument as to why the ratio disproportionately impacts the African–American community; and (3) the district court did not fully appreciate its own authority in crafting a fair sentence.

### 1. Standard of Review

As a threshold matter, the government asserts that Vance did not timely appeal

his sentence. Vance contends that his appeal was timely since the entry of judgment occurred on January 8, 2015 and not on December 3, 2013. The district court entered judgment against Vance on December 3, 2013. On September 17, 2014, Vance filed a motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. On January 8, 2015, the district court granted Vance's § 2255 motion for the limited purpose of filing a delayed appeal in the underlying criminal case. Vance filed his notice of appeal on January 14, 2015.

We hold that Vance's appeal was timely. *See Roe v. Flores–Ortega*, 528 U.S. 470, 484, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000) ("[W]e hold that when counsel's constitutionally deficient performance deprives a defendant of an appeal that he otherwise would have taken, the defendant has made out a successful ineffective assistance of counsel claim entitling him to an appeal.").

We review a district court's factual findings in sentencing a defendant under the clearly erroneous standard, *United States v. Hazelwood*, 398 F.3d 792, 795 (6th Cir. 2005), and its application and interpretation of the Sentencing Guidelines *de novo*, *United States v. Cousins*, 469 F.3d 572, 575 (6th Cir. 2006). A district court's decision will be found to be clearly erroneous where, having reviewed all of the evidence, we are left with the definite and firm conviction that a mistake has been made. *Jeross*, 521 F.3d at 569 (citing *United States v. Worley*, 193 F.3d 380, 384 (6th Cir. 1999)).

The ultimate sentence is reviewed for reasonableness. *Gall v. United States*, 552 U.S. 38, 51, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007); *see also United States v. Thomas*, 498 F.3d 336, 339 (6th Cir. 2007). We use the abuse of discretion standard to determine whether a defendant's sentence is reasonable. *Gall*, 552 U.S. at 51, 128

S.Ct. 586 ("Regardless of whether the sentence imposed is inside or outside the Guidelines range, the appellate court must review the sentence under an abuse-of-discretion standard.").

### 2. Analysis

A review for reasonableness has both procedural and substantive components. *Gall*, 552 U.S. at 51, 128 S.Ct. 586. In regards to the procedural component, the Supreme Court has stated that the appellate court:

> [M]ust ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence— including an explanation for any deviation from the Guidelines range.

*Id.* "[W]here a district court makes a mistake in calculating a guidelines range for purposes of determining a sentence under section 3553(a), we are required to remand for resentencing unless we are certain that any such error was harmless." *United States v. Vicol*, 514 F.3d 559, 561 (6th Cir. 2008) (citation and internal quotation marks omitted). A sentencing error is harmless if we are certain that the error "did not affect the district court's selection of the sentence imposed." *Hazelwood*, 398 F.3d at 801 (quoting *Williams v. United States*, 503 U.S. 193, 203, 112 S.Ct. 1112, 117 L.Ed.2d 341 (1992)).

If the district court's sentencing decision is procedurally sound, we should then consider the substantive reasonableness of the sentence imposed under an abuse of discretion standard. *Id.* During

this review, we will take into account the totality of the circumstances, including:

> [T]he extent of any variance from the Guidelines range. If the sentence is within the Guidelines range, the appellate court may, but is not required to, apply a presumption of reasonableness. [ ] But if the sentence is outside the Guidelines range, the court may not apply a presumption of unreasonableness. It may consider the extent of the deviation, but must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance. The fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court.

 *Gall*, 552 U.S. at 51, 128 S.Ct. 586. For a sentence to be substantively reasonable, "it must be proportionate to the seriousness of the circumstances of the offense and offender, and sufficient but not greater than necessary, to comply with the purposes of § 3553(a)." *United States v. Vowell*, 516 F.3d 503, 512 (6th Cir. 2008) (citation and internal quotation marks omitted).

### a. Consideration of § 3553(a) Factors

 Vance first argues that the district court erred in failing to adequately consider the factors set forth in § 3553(a). Vance pleaded guilty to: Count One, conspiracy to distribute and possess with the intent to distribute controlled substances, including 500 grams or more of cocaine and 280 grams or more of crack cocaine; Count Two, possession with intent to distribute 28 grams or more of crack cocaine; Count Eight, accessory after the fact of a Hobbs Act violation (robbery) resulting in death; and Count Nine, conspiracy to commit a Hobbs Act robbery.

The district court found Vance to have a total offense level of 39 and a criminal history category I. These findings were in line with Vance's presentence investigation report ("PSR") filed by the probation office. Vance accepted that he was responsible for selling three kilograms of crack cocaine, which resulted in a base offense level of 36 under U.S.S.G. § 2D1.1(c)(2). Two levels were added because Vance possessed a firearm pursuant to U.S.S.G. § 2D1.1(b)(1), and another four levels were added because Vance was an organizer or leader of a criminal activity that involved five or more participants pursuant to U.S.S.G. § 3B1.1(a), resulting in an adjusted offense level of 42. The offense level was adjusted downward by three levels for Vance's acceptance of responsibility.

Based on the adjusted offense level and Vance's criminal history category, the Guidelines range was 262 to 327 months of imprisonment for counts One, Two, Eight, and Nine. The district court ultimately sentenced Vance to a below Guidelines sentence of 200–months' imprisonment and supervised release of five years for all counts running concurrently.

The record clearly demonstrates that the district court considered the § 3553(a) factors. After listening to defense counsel, Vance, and Vance's witness for several hours at the sentencing hearing, the court stated the following:

> "[W]e've spent a lot of time talking about the 3553 factors and when imposing that sentence. I've considered the nature and circumstances of the offenses. They're clearly serious offenses. There's no way around that. And you were clearly incredibly involved not just in your part but as a leadership role in this, your role in the gang, your role in the distribution and the movement of the drugs in and out.

I've also considered your criminal history or in this case a lack of criminal history. There's clearly a need to impose a sentence that reflects the seriousness of these offenses. You know, [the witness] talked about the serious public health issue that drugs cause in this community, your community, all of our communities. There was, having listened to the tapes and reading what is an accurate presentation of the facts in this case through the presentence report, a complete lack of respect for the law.

There's clearly a need in this case to provide not only a just punishment but provide deterrence to others.... There is a need to avoid the unwarranted sentencing disparities. I think it was important to look and its important to factor in what the other co-defendants got in this case, but I think you have to look at the 262, that at least three, maybe four, but I think three of the co-defendants got and they had—I think they were all career offenders and very different. Although their offense levels were slightly less, their history levels were significantly greater. So I've included that in my analysis in trying to come up with a just punishment that's an aggregate of all those factors and that sufficient but not more harsh than necessary.

(R. 2293, Sentencing Tr. Brian Vance, PageID# 118–19.) As the record demonstrates, the district court considered the § 3553(a) factors and fashioned a sentence that reflected those factors. Although the court was clearly concerned with the nature and seriousness of the offenses, it also considered other § 3553(a) factors, such as protecting the public, adequately deterring others, providing just punishment for the offense, promoting respect for the law, reflecting the seriousness of the offense, and the history and characteristics of Vance. *See* 18 U.S.C. § 3553(a). Thus, we find that

the district court did not err in considering the § 3553(a) factors.

**b. Policy-based Variance from Guidelines**

Vance next argues that his sentence was unreasonable because the district court erroneously relied on the 18–to–1 cocaine to crack cocaine ratio in U.S.S.G. § 2D1.1(c) and rejected Vance's policy-based argument as to why the ratio disproportionately impacts the African–American community.

During sentencing, Vance advanced a substantive, policy-based reason why the district court should impose a lower sentence: that the Sentencing Guidelines disproportionately punish those convicted of crimes involving crack cocaine and those convicted of such crimes are predominately from the African–American community. Specifically, Vance objected to the district court's application of the Guidelines' drug tables, or the 18–to–1 ratio for crack cocaine versus powder cocaine identified in U.S.S.G. § 2D1.1.

For example, the Guidelines sentence those convicted of possessing 28 grams of crack cocaine to the same sentence as those who possess 500 grams of cocaine powder, resulting in an 18–to–1 ratio of powder-to-crack cocaine quantities that trigger the same offense level. *See* U.S.S.G. § 2D1.1(c)(7)(2011). The Fair Sentencing Act of 2010, Pub. L. No. 111–220, 124 Stat. 2372, established the current ratio, lowering it from a harsher 100–to–1 ratio in response to criticism from courts and commentators. *United States v. Thomas*, 501 Fed.Appx. 391, 392 (6th Cir. 2012) (citing *United States v. Shull*, 793 F.Supp.2d 1048, 1050–57 (S.D. Ohio 2011) (recounting history of the Fair Sentencing Act)).

Vance urged the district court to adopt a 1–to–1 ratio. Vance discussed the criticism

surrounding the ratio, supporting cases, and included statistics such as the report generated by the Sentencing Commission which "confirm[ed] that in 2006, 82 percent of individuals convicted of federal crack cocaine offenses were African American while just 9 percent were white." (R. 2293 at 26–71.) The court considered Vance's two-hour long argument on this matter, but resolved to apply the 18–to–1 ratio: "I think justice can be done in this case using and applying the 18–to–1 ratio. It's appropriate in this case. In this case that's consistent with the 3553 goals, so I'm going to apply the 18–to–1 ratio." (*Id.* at 72–73.)

District courts enjoy broad discretion to fashion a sentence within the Guidelines range. *See United States v. Overmyer*, 663 F.3d 862, 863 (6th Cir. 2011) (citing *United States v. Booker*, 543 U.S. 220, 233, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005)). Vance argues that the district court erred in rejecting his 1–to–1 policy-based argument, and that he was prejudiced by this error because his total offense level would have been 31 rather than 39, which would have provided Vance with a Guidelines range of 108 to 135 months. "[T]he fact that a district court *may* disagree with a Guideline for policy reasons and *may* reject the Guidelines range because of that disagreement does not mean that the court *must* disagree with that Guideline or that it *must* reject the Guidelines range if it disagrees." *United States v. Brooks*, 628 F.3d 791, 800 (6th Cir. 2011) (citing *United States v. Mikowski*, 332 Fed.Appx. 250, 255–56 (6th Cir. 2009)). Although there may be merit to the policy-based argument, the district court acted within its discretion in declining to follow it.

### c. Appreciation of Authority

Vance also avers that the district court did not appreciate its authority in crafting a fair sentence. The record of the sentencing hearing repudiates Vance's assertion: "I'm not bound to sentence Mr. Vance within the suggested range. Rather, I can use my discretion in deciding whether to depart or vary up or down weighing factors in 3553(a).... Clearly the [c]ourt has the authority to vary from that ratio.... I think justice can be done in this case using and applying the 18–to–1 ratio.... In this case that's consistent with the 3553 goals." (R. 2293 at 5–6, 71–72.)

In addition, the district court expressly stated that the Guidelines "are merely advisory." (R. 2293 at 5.) This Court has held that "when a district court observes that the Guidelines are advisory and provides no indication that policy disagreements are not a proper basis to vary, then a sentence within the Guidelines range remains presumptively reasonable on appeal." *United States v. Simmons*, 587 F.3d 348, 364 (6th Cir. 2009).

To belabor the point, we have noted that "simple logic compels the conclusion that, if a sentence of 324 to 405 months would have been presumptively reasonable in length, defendant's task of persuading us that the more lenient sentence of 240 months is unreasonably long is even more demanding." *United States v. Curry*, 536 F.3d 571, 573 (6th Cir. 2008) (citing *United States v. Bailey*, 264 Fed.Appx. 480 (6th Cir. 2008) (recognizing that since, per *United States v. Vonner*, 516 F.3d 382, 389–90 (6th Cir. 2008) (en banc), a within Guidelines sentence would be presumptively reasonable, it logically follows that a below Guidelines sentence is "presumed not to be unreasonably severe")). Vance has not met that demanding burden.

Accordingly, we find that the district court did not plainly err in sentencing Vance.

374

### III. CONCLUSION

We recognize that Defendants' trial and sentencings were not without error, although none of the errors are reversible. Having carefully examined the record, we are satisfied that Defendants received a fundamentally fair trial. Accordingly, we **AFFIRM** Defendants' convictions and sentences.